# IDAHO ET AL. *v.* COEUR D'ALENE TRIBE OF IDAHO ET AL.

No. 94–1474.   Argued October 16, 1996—Decided June 23, 1997

262

KENNEDY, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, and III, in which REHN-

QUIST, C. J., and O'CONNOR, SCALIA, and THOMAS, JJ., joined, and an opinion with respect to Parts II–B, II–C, and II–D, in which REHNQUIST, C. J., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, in which SCALIA and THOMAS, JJ., joined, *post*, p. 288. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined, *post*, p. 297.

*Clive J. Strong*, Deputy Attorney General of Idaho, argued the cause for petitioners. With him on the briefs were *Alan G. Lance*, Attorney General, and *Steven W. Strack*, Deputy Attorney General.

*Raymond C. Givens* argued the cause for respondents. With him on the brief were *David J. Bederman* and *Shannon D. Work.**

JUSTICE KENNEDY announced the judgment of the Court and delivered the opinion of the Court with respect to Parts

---

*\*Richard Ruda* and *James I. Crowley* filed a brief for the Council of State Governments et al. as *amici curiae* urging reversal.

Briefs of *amicus curiae* urging affirmance were filed for the United States by *Acting Solicitor General Dellinger, Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler, Jeffrey P. Minear, Anne S. Almy*, and *Edward J. Shawaker*; and for the American Civil Liberties Union by *Robin L. Dahlberg* and *Steven R. Shapiro.*

Briefs of *amici curiae* were filed for the State of California et al. by *Daniel E. Lungren*, Attorney General of California, *Roderick E. Walston*, Chief Assistant Attorney General, and *Jan S. Stevens*, Assistant Attorney General, joined by the Attorneys General for their respective States as follows: *Jeff Sessions* of Alabama, *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Gale A. Norton* of Colorado, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Margery S. Bronster* of Hawaii, *Thomas J. Miller* of Iowa, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Jeremiah W. Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Dennis C. Vacco* of New York, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Mark Barnett* of South Dakota, *Jan Graham* of Utah, *Christine O. Gregoire* of Washington, and *James E. Doyle* of Wisconsin; and for the Stockbridge-Munsee Indian Community by *Richard Dauphinais.*

I, II–A, and III, and an opinion with respect to Parts II–B, II–C, and II–D, in which THE CHIEF JUSTICE joins.

In the northern region of Idaho, close by the Coeur d'Alene Mountains which are part of Bitterroot Range, lies tranquil Lake Coeur d'Alene. One of the Nation's most beautiful lakes, it is some 24 miles long and 1 to 3 miles wide. The Spokane River originates here and thence flows west, while the lake in turn is fed by other rivers and streams, including Coeur d'Alene River which flows to it from the east, as does the forested Saint Joe River which begins high in the Bitterroots and gathers their waters along its 130-mile journey. To the south of the lake lies the more populated part of the Coeur d'Alene Reservation. Whether the Coeur d'Alene Tribe's ownership extends to the banks and submerged lands of the lake and various of these rivers and streams, or instead ownership is vested in the State of Idaho, is the underlying dispute. We are limited here, however, to the important, preliminary question whether the Eleventh Amendment bars a federal court from hearing the Tribe's claim.

## I

Alleging ownership in the submerged lands and bed of Lake Coeur d'Alene and of the various navigable rivers and streams that form part of its water system, the Coeur d'Alene Tribe, a federally recognized Tribe, together with various individual Tribe members, sued in federal court. As there is no relevant distinction between the Tribe and those of its members who have joined the suit, for purposes of the issue we decide, we refer to them all as the Tribe. The Coeur d'Alene Reservation consists of some 13,032 acres of tribal land, 55,583 acres of allotted land, and 330 Government owned acres. Statistical Record of Native North Americans 53 (M. Raddy ed. 1995). The Tribe claimed the beneficial interest, subject to the trusteeship of the United States, in the beds and banks of all navigable watercourses

and waters (the "submerged lands") within the original boundaries of the Coeur d'Alene Reservation, as defined by Executive Order on November 8, 1873. Exec. Order of Nov. 8, 1873, reprinted in 1 C. Kappler, Indian Affairs: Laws and Treaties 837 (1904). The area in dispute includes the banks and beds and submerged lands of Lake Coeur d'Alene and some portions of the various rivers and streams we have described. In the alternative, the Tribe claimed ownership of the submerged lands pursuant to unextinguished aboriginal title. A state forum was available, see Idaho Code § 5-328 (1990), but the Tribe brought this action in the United States District Court for the District of Idaho.

The suit named the State of Idaho, various state agencies, and numerous state officials in their individual capacities. In addition to its title claims, the Tribe further sought a declaratory judgment to establish its entitlement to the exclusive use and occupancy and the right to quiet enjoyment of the submerged lands as well as a declaration of the invalidity of all Idaho statutes, ordinances, regulations, customs, or usages which purport to regulate, authorize, use, or affect in any way the submerged lands. Finally, it sought a preliminary and permanent injunction prohibiting defendants from regulating, permitting, or taking any action in violation of the Tribe's rights of exclusive use and occupancy, quiet enjoyment, and other ownership interest in the submerged lands along with an award for costs and attorney's fees and such other relief as the court deemed appropriate.

The defendants moved to dismiss the Tribe's complaint on Eleventh Amendment immunity grounds and for failure to state a claim upon which relief could be granted. The court held the Eleventh Amendment barred the claims against Idaho and the agencies. It concluded further that the action against the officials for quiet title and declaratory relief was barred by the Eleventh Amendment because these claims were the functional equivalents of a damages award against the State. It dismissed the claim for injunctive relief

against the officials, on the merits, since Idaho was in rightful possession of the submerged lands as a matter of law. It explained that Idaho acquired ownership of the submerged lands upon its statehood in 1890 under the equal footing doctrine. The court did not discuss the Tribe's claim to aboriginal title. 798 F. Supp. 1443 (1992).

The Ninth Circuit affirmed in part, reversed in part, and remanded. 42 F. 3d 1244 (1994). It agreed with the District Court that the Eleventh Amendment barred all claims against the State and its agencies, as well as the quiet title action against the officials. The Court of Appeals found the *Ex parte Young*, 209 U. S. 123 (1908), doctrine applicable and allowed the claims for declaratory and injunctive relief against the officials to proceed insofar as they sought to preclude continuing violations of federal law. The requested declaratory and injunctive relief, the Court of Appeals reasoned, is based upon Idaho's ongoing interference with the Tribe's alleged ownership rights premised on the 1873 Executive Order as later ratified by federal statute. See Act of Mar. 3, 1891, ch. 543, § 19, 26 Stat. 1026–1029. It further found it conceivable that the Tribe could prove facts entitling it to relief. It reversed the District Court's dismissal of the declaratory and injunctive relief claims and ordered the case remanded. It also remanded for consideration of the Tribe's claim for declaratory relief based on aboriginal title. We granted certiorari, 517 U. S. 1132 (1996), to consider whether the suit for declaratory and injunctive relief based on the Tribe's purported beneficial interest in title may proceed, and we now reverse in part.

After issuance of the District Court's opinion the United States filed suit against the State of Idaho on behalf of the Tribe seeking to quiet title to approximately a third of the land covered by this suit. *United States* v. *Idaho*, No. 94–0328 (D. Idaho, filed July 21, 1994). The Government's separate suit is still pending and is not implicated here.

## II

### A

The grant of federal judicial power is cast in terms of its reach or extent. Article III, § 2, of the Constitution provides the "judicial Power shall extend" to the cases it enumerates, including "all Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States." The Eleventh Amendment, too, employs the term "extend." It provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

This point of commonality could suggest that the Eleventh Amendment, like the grant of Article III, § 2, jurisdiction, is cast in terms of reach or competence, so the federal courts are altogether disqualified from hearing certain suits brought against a State. This interpretation, however, has been neither our tradition nor the accepted construction of the Amendment's text. Rather, a State can waive its Eleventh Amendment protection and allow a federal court to hear and decide a case commenced or prosecuted against it. The Amendment, in other words, enacts a sovereign immunity from suit, rather than a nonwaivable limit on the Federal Judiciary's subject-matter jurisdiction. The immunity is one the States enjoy save where there has been " 'a surrender of this immunity in the plan of the convention.' " *Principality of Monaco* v. *Mississippi*, 292 U. S. 313, 322–323 (1934) (quoting The Federalist No. 81).

The Court's recognition of sovereign immunity has not been limited to the suits described in the text of the Eleventh Amendment. To respect the broader concept of immunity, implicit in the Constitution, which we have regarded

the Eleventh Amendment as evidencing and exemplifying, we have extended a State's protection from suit to suits brought by the State's own citizens. *Hans* v. *Louisiana,* 134 U. S. 1 (1890). Furthermore, the dignity and respect afforded a State, which the immunity is designed to protect, are placed in jeopardy whether or not the suit is based on diversity jurisdiction. As a consequence, suits invoking the federal-question jurisdiction of Article III courts may also be barred by the Amendment. *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44 (1996).

In extended criticisms of the Court's recognition that the immunity can extend to suits brought by a State's own citizens and to suits premised on federal questions, some of them as recent as last Term, see *id.,* at 83–93 (STEVENS, J., dissenting); *id.,* at 109–110 (SOUTER, J., dissenting), various dissenting and concurring opinions have urged a change in direction. See, *e. g., Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 247 (1985) (Brennan, J., dissenting). Were we to abandon our understanding of the Eleventh Amendment as reflecting a broader principle of sovereign immunity, the Tribe's suit, which is based on its purported federal property rights, might proceed. These criticisms and proposed doctrinal revisions, however, have not found acceptance with a majority of the Court. We adhere to our precedent.

Under well-established principles, the Coeur d'Alene Tribe, and, *a fortiori,* its members, are subject to the Eleventh Amendment. In *Blatchford* v. *Native Village of Noatak,* 501 U. S. 775, 779–782 (1991), we rejected the contention that sovereign immunity only restricts suits by individuals against sovereigns, not by sovereigns against sovereigns. Since the plan of the Convention did not surrender Indian tribes' immunity for the benefit of the States, we reasoned that the States likewise did not surrender their immunity for the benefit of the tribes. Indian tribes, we therefore concluded, should be accorded the same status as foreign sover-

eigns, against whom States enjoy Eleventh Amendment immunity. *Id.,* at 782.

The Tribe's suit, accordingly, is barred by Idaho's Eleventh Amendment immunity unless it falls within the exception this Court has recognized for certain suits seeking declaratory and injunctive relief against state officers in their individual capacities. See *Ex parte Young,* 209 U. S. 123 (1908). The *Young* exception to sovereign immunity was an important part of our jurisprudence when the Court adhered to its precedents in the face of the criticisms we have mentioned, and when the Court, overruling *Pennsylvania* v. *Union Gas Co.,* 491 U. S. 1 (1989), held that Congress, in the exercise of its power to regulate commerce with Indian tribes, may not abrogate state sovereign immunity. *Seminole Tribe, supra,* at 71, n. 14. We do not, then, question the continuing validity of the *Ex parte Young* doctrine. Of course, questions will arise as to its proper scope and application. In resolving these questions we must ensure that the doctrine of sovereign immunity remains meaningful, while also giving recognition to the need to prevent violations of federal law.

When suit is commenced against state officials, even if they are named and served as individuals, the State itself will have a continuing interest in the litigation whenever state policies or procedures are at stake. This commonsense observation of the State's real interest when its officers are named as individuals has not escaped notice or comment from this Court, either before or after *Young.* See, *e. g., Osborn* v. *Bank of United States,* 9 Wheat. 738, 846–847 (1824) (stating that the State's interest in the suit was so "direct" that "perhaps no decree ought to have been pronounced in the cause, until the State was before the court") (Marshall, C. J.); *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S. 89, 114, n. 25 (1984) (noting that *Young* rests on a fictional distinction between the official and the State); see also *Florida Dept. of State* v. *Treasure Salvors, Inc.,* 458

U. S. 670, 685 (1982) (opinion of STEVENS, J.) (recognizing the irony that a state official's conduct may be considered "'state action'" for Fourteenth Amendment purposes yet not for purposes of the Eleventh Amendment). Indeed, the suit in *Young*, which sought to enjoin the state attorney general from enforcing state law, implicated substantial state interests. 209 U. S., at 174 ("[T]he manifest, indeed the avowed and admitted, object of seeking [the requested] relief [is] *to tie the hands* of the *State*") (Harlan, J., dissenting). We agree with these observations.

To interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle, reaffirmed just last Term in *Seminole Tribe*, that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction. The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading. Application of the *Young* exception must reflect a proper understanding of its role in our federal system and respect for state courts instead of a reflexive reliance on an obvious fiction. See, *e. g., Pennhurst, supra,* at 102–103, 114, n. 25 (explaining that the limitation in *Edelman* v. *Jordan,* 415 U. S. 651 (1974), of *Young* to prospective relief represented a refusal to apply the fiction in every conceivable circumstance).

### B

Putting aside the acts of state officials which are plainly ultra vires under state law itself, see *Pennhurst, supra,* at 101–102, n. 11, there are, in general, two instances where *Young* has been applied. The first is where there is no state forum available to vindicate federal interests, thereby placing upon Article III courts the special obligation to ensure the supremacy of federal statutory and constitutional law. This is a most important application of the *Ex parte Young*

doctrine and is exemplified by the facts in *Young* itself. See 209 U. S., at 146 ("The necessary effect and result of [the challenged] legislation must be to preclude a resort to the courts (either state or Federal) for the purpose of testing its validity").

As is well known, the ultimate question in *Young* was whether the State's attorney general could enforce a state ratesetting scheme said by the objecting shareholders of railroad companies to be unconstitutional. The shareholders sought a federal injunction against Attorney General Young, prohibiting enforcement of the rate scheme. Attempting to show the lack of necessity for federal intervention, Young maintained the shareholders could wait until a state enforcement proceeding was brought against the railroads and then test the law's validity by raising constitutional defenses. The Court rejected the argument, first because a single violation might not bring a prompt prosecution; and second because the penalties for violations were so severe a railroad official could not test the law without grave risk of heavy fines and imprisonment. The Court added that a federal suit for injunctive relief would be "undoubtedly the most convenient, the most comprehensive and the most orderly way in which the rights of all parties can be properly, fairly and adequately passed upon." *Id.*, at 166.

Where there is no available state forum the *Young* rule has special significance. In that instance providing a federal forum for a justiciable controversy is a specific application of the principle that the plan of the Convention contemplates a regime in which federal guarantees are enforceable so long as there is a justiciable controversy. The Federalist No. 80, p. 475 (C. Rossiter ed. 1961) (A. Hamilton) ("[T]here ought always to be a constitutional method of giving efficacy to constitutional provisions"). We, of course, express no opinion as to the circumstances in which the unavailability of injunctive relief in state court would raise constitutional concerns under current doctrine.

*Young* was not an isolated example of an instance where a state forum was unavailable. See, *e. g., Osborn, supra,* at 842–843 (explaining that if it was within the power of the plaintiff to make the State a party to the suit it would "certainly [be] true" that a suit against state officials would be barred, but if the "real principal" is "exempt from all judicial process" an officer suit could proceed); *United States* v. *Lee,* 106 U. S. 196 (1882) (permitting suit for injunctive relief to proceed where there did not otherwise exist a legal remedy for the alleged trespass); *Poindexter* v. *Greenhow,* 114 U. S. 270, 299 (1885) (explaining that the state-law remedy for Virginia's unconstitutional refusal to accept its own bond coupons in satisfaction of state taxes was, in fact, "no remedy"). In these early cases, the Court, although expressing concern over the lack of a forum, did not rely on the lack of a forum as its doctrinal basis. After abandonment of *Osborn's* rule that a suit was not against the State so long as the State was not a party of record, see *Governor of Georgia* v. *Madrazo,* 1 Pet. 110, 124 (1828), the *Young* fiction was employed where "the act complained of, considered apart from the official authority alleged as its justification, and as the personal act of the individual defendant, constituted a violation of right for which the plaintiff was entitled to a remedy at law or in equity against the wrongdoer in his individual character." *In re Ayers,* 123 U. S. 443, 502 (1887). In other words, where the individual would have been liable at common law for his actions, sovereign immunity was no bar regardless of the person's official position. See, *e. g., Lee, supra,* at 221 (common-law tort of trespass); *Belknap* v. *Schild,* 161 U. S. 10, 18 (1896) (common-law tort of patent infringement); *Tindal* v. *Wesley,* 167 U. S. 204, 221–222 (1897) (common-law tort of trespass); *Scully* v. *Bird,* 209 U. S. 481, 483 (1908) (common-law tort of injuring plaintiff's reputation and sale of certain products). Under this line of reasoning, a state official who committed a common-law tort was said to have

been "stripped" of his official or representative character. See *Young, supra,* at 159–160; *Poindexter, supra,* at 288.

With the growth of statutory and complex regulatory schemes, this mode of analysis might have been somewhat obscured. Part of the significance of *Young,* in this respect, lies in its treatment of a threatened suit by an official to enforce an unconstitutional state law as if it were a common-law tort. See 209 U. S., at 158 (treating this possibility as a "specific wrong or trespass"); *id.,* at 167 ("The difference between an actual and direct interference with tangible property and the enjoining of state officers from enforcing an unconstitutional act, is not of a radical nature"). Treatment of a threatened suit to enforce an unconstitutional statute as a tort found support in *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362 (1894), and *Smyth* v. *Ames,* 169 U. S. 466 (1898). See Currie, Sovereign Immunity and Suits Against Government Officers, 1984 S. Ct. Rev. 149, 154, and n. 35. By employing the common-law injury framework, the *Young* Court underscored the inadequacy of state procedures for vindicating the constitutional rights at stake. 209 U. S., at 163–166. The enforcement scheme in *Young,* which raised obstacles to the vindication of constitutional claims, was not unusual. See, *e. g., Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19, 53–54 (1909) (discussing the "enormous and overwhelming" penalties for violating the challenged statutes); *Western Union Telegraph Co.* v. *Andrews,* 216 U. S. 165 (1910) (penalties for each violation of the challenged statute included $1,000 fine); *Herndon* v. *Chicago, R. I. & P. R. Co.,* 218 U. S. 135, 151 (1910) (penalties for violating the challenged statute could "in a short time . . . amount to many thousands of dollars"); *Oklahoma Operating Co.* v. *Love,* 252 U. S. 331, 336 (1920) (penalties for violations are "such as might well deter even the boldest and most confident"). In many situations, as in the above-cited cases, the exercise of a federal court's equitable jurisdiction was necessary to avoid "excessive and oppressive penalties, [the] possibility of [a]

multiplicity of suits causing irreparable damage, or [the] lack of proper opportunities for [state] review." Warren, Federal and State Court Interference, 43 Harv. L. Rev. 345, 377–378 (1930).

The reluctance to place much reliance on the availability of a state forum can be understood in part by the prevalence of the idea that if a State consented to suit in a state forum it had consented, by that same act, to suit in a federal forum. See, *e. g., Davis* v. *Gray,* 16 Wall. 203, 221 (1873); *Reagan* v. *Farmers' Loan & Trust Co., supra,* at 391. Today, by contrast, it is acknowledged that States have real and vital interests in preferring their own forums in suits brought against them, interests that ought not to be disregarded based upon a waiver presumed in law and contrary to fact. See, *e. g., Edelman* v. *Jordan,* 415 U. S., at 673. In this case, there is neither warrant nor necessity to adopt the *Young* device to provide an adequate judicial forum for resolving the dispute between the Tribe and the State. Idaho's courts are open to hear the case, and the State neither has nor claims immunity from their process or their binding judgment.

## C

Even if there is a prompt and effective remedy in a state forum, a second instance in which *Young* may serve an important interest is when the case calls for the interpretation of federal law. This reasoning, which is described as the interest in having federal rights vindicated in federal courts, can lead to expansive application of the *Young* exception. See, *e. g., Green* v. *Mansour,* 474 U. S. 64, 68 (1985) (explaining that *Young* furthers the federal interest in vindicating federal law); *Pennhurst,* 465 U. S., at 105 ("[T]he *Young* doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights" (citation omitted)). It is difficult to say States consented to these types of suits in the plan of the Convention. Neither in theory nor in practice has it been shown problematic to have federal claims re-

solved in state courts where Eleventh Amendment immunity would be applicable in federal court but for an exception based on *Young.* For purposes of the Supremacy Clause, it is simply irrelevant whether the claim is brought in state or federal court. Federal courts, after all, did not have general federal-question jurisdiction until 1875. Assuming the availability of a state forum with the authority and procedures adequate for the effective vindication of federal law, due process concerns would not be implicated by having state tribunals resolve federal-question cases.

In some cases, it is true, the federal courts play an indispensable role in maintaining the structural integrity of the constitutional design. A federal forum assures the peaceful resolution of disputes between the States, *South Dakota* v. *North Carolina,* 192 U. S. 286 (1904), and suits initiated by the United States against States, *United States* v. *Texas,* 143 U. S. 621 (1892). While we can assume there is a special role for Article III courts in the interpretation and application of federal law in other instances as well, we do not for that reason conclude that state courts are a less than adequate forum for resolving federal questions. A doctrine based on the inherent inadequacy of state forums would run counter to basic principles of federalism. In *Stone* v. *Powell,* 428 U. S. 465 (1976), we expressed our "emphatic reaffirmation . . . of the constitutional obligation of the state courts to uphold federal law, and [our] expression of confidence in their ability to do so." *Allen* v. *McCurry,* 449 U. S. 90, 105 (1980).

Interpretation of federal law is the proprietary concern of state, as well as federal, courts. It is the right and duty of the States, within their own judiciaries, to interpret and to follow the Constitution and all laws enacted pursuant to it, subject to a litigant's right of review in this Court in a proper case. The Constitution and laws of the United States are not a body of law external to the States, acknowledged and enforced simply as a matter of comity. The Constitution is

the basic law of the Nation, a law to which a State's ties are no less intimate than those of the National Government itself. The separate States and the Government of the United States are bound in the common cause of preserving the whole constitutional order. Federal and state law "together form one system of jurisprudence." *Claflin* v. *Houseman*, 93 U. S. 130, 137 (1876). It would be error coupled with irony were we to bypass the Eleventh Amendment, which enacts a scheme solicitous of the States, on the sole rationale that state courts are inadequate to enforce and interpret federal rights in every case.

It is a principal concern of the court system in any State to define and maintain a proper balance between the State's courts on one hand, and its officials and administrative agencies on the other. This is of vital concern to States. As the Idaho State Attorney General has explained: "Everywhere a citizen turns—to apply for a life-sustaining public benefit, to obtain a license, to respond to a complaint—it is [administrative law] that governs the way in which their contact with state government will be carried out." EchoHawk, Introduction to Administrative Procedure Act Issue, 30 Idaho L. Rev. 261 (1994). In the States there is an ongoing process by which state courts and state agencies work to elaborate an administrative law designed to reflect the State's own rules and traditions concerning the respective scope of judicial review and administrative discretion. An important case such as the instant one has features which instruct and enrich the elaboration of administrative law that is one of the primary responsibilities of the state judiciary. Where, as here, the parties invoke federal principles to challenge state administrative action, the courts of the State have a strong interest in integrating those sources of law within their own system for the proper judicial control of state officials.

Our precedents do teach us, nevertheless, that where prospective relief is sought against individual state officers in a

federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar. See, *e. g.*, *Willcox*, 212 U. S., at 40. Indeed, since *Edelman* we have consistently allowed suits seeking prospective injunctive relief based on federal violations to proceed. Last Term, however, we did not allow a suit raising a federal question to proceed based on Congress' provision of an alternative review mechanism. Whether the presumption in favor of federal-court jurisdiction in this type of case is controlling will depend upon the particular context. What is really at stake where a state forum is available is the desire of the litigant to choose a particular forum versus the desire of the State to have the dispute resolved in its own courts. The Eleventh Amendment's background principles of federalism and comity need not be ignored in resolving these conflicting preferences. The *Young* exception may not be applicable if the suit would "upset the balance of federal and state interests that it embodies." *Papasan* v. *Allain*, 478 U. S. 265, 277 (1986). The exception has been "tailored to conform as precisely as possible to those specific situations in which it is necessary to permit the federal courts to vindicate federal rights." *Ibid.* (citation and internal quotation marks omitted); see also *Pennhurst*, 465 U. S., at 104, n. 13.

The course of our case law indicates the wisdom and necessity of considering, when determining the applicability of the Eleventh Amendment, the real affront to a State of allowing a suit to proceed. As we explained in *Ford Motor Co.* v. *Department of Treasury of Ind.*, 323 U. S. 459 (1945): "[T]he nature of a suit as one against the state is to be determined by the essential nature and effect of the proceeding." *Id.*, at 464. We held that "when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Ibid.* *In re Ayers*, cited with approval in *Young*, stated that it is not "conclu-

sive of the principal question in this case, that the [State] is not named as a party defendant. Whether it is the actual party, in the sense of the prohibition of the Constitution, must be determined by a consideration of the nature of the case as presented on the whole record." 123 U. S., at 492. See also *Ex parte New York,* 256 U. S. 490, 500 (1921) (*Young*'s applicability "is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record"). Of course, the State's interests are almost always implicated to a certain extent in *Young* actions, but the statements we cite reflect the Court's recognition "that the need to promote the supremacy of federal law must be accommodated to the constitutional immunity of the States." *Pennhurst, supra,* at 105.

## D

Our recent cases illustrate a careful balancing and accommodation of state interests when determining whether the *Young* exception applies in a given case. In *Edelman v. Jordan,* 415 U. S. 651 (1974), the relief granted by the Federal District Court required state officials to release and remit federal benefits. While the District Court's order might have served the goal of deterrence as well as compensation, we concluded the suit was barred by the Eleventh Amendment because it was not necessary for the vindication of federal rights. In reaching this conclusion, we explained that "we must judge the award actually made in this case, and not one which might have been differently tailored in a different case." *Id.,* at 665. There was no need for the *Edelman* Court to consider the other relief granted by the District Court, prospectively enjoining state officials from failing to abide by federal requirements, since it was conceded that *Young* was sufficient for this purpose. 415 U. S., at 664. The second time the *Edelman* litigation came before the Court, in *Quern v. Jordan,* 440 U. S. 332 (1979), we made

a point of saying the relief sought pursuant to the *Young* action was a notice "simply inform[ing] class members that their federal suit is at an end, that the federal court can provide them with no further relief, and that there are existing state administrative procedures . . . . Petitioner raises no objection to the expense of preparing or sending it. The class members are given no more . . . than what they would have gathered by sitting in the courtroom." 440 U. S., at 349 (citation and internal quotation marks omitted).

*Milliken* v. *Bradley,* 433 U. S. 267 (1977), is consistent with this approach. Although authorizing relief having an undeniably substantial effect on the State, *Milliken* does not obviate the need for careful consideration of a suit's impact. *Milliken* concerned a *Young* suit against various Michigan officials resulting in a District Court order requiring the State, along with the Detroit School Board, to pay for a comprehensive education program for schoolchildren who had been subjected to past acts of *de jure* segregation. The gravamen of the complaint and its ultimate purpose was to vindicate the plaintiffs' civil liberties, not to establish ownership over state resources or funds. The *Milliken* lawsuit and the resulting order were a direct result of the State's "official acts of racial discrimination committed by both the Detroit School Board and the State of Michigan" in violation of the Fourteenth Amendment. 433 U. S., at 269. If Congress pursuant to its § 5 remedial powers under the Fourteenth Amendment may abrogate sovereign immunity, even if the resulting legislation goes beyond what is constitutionally necessary, see, *e. g., Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976) (concluding that Title VII's authorization of federal-court jurisdiction to award money damages against a state government to individuals subjected to employment discrimination does not violate the Eleventh Amendment since Congress was exercising its § 5 remedial powers), it follows that the substantive provisions of the Fourteenth Amendment themselves offer a powerful reason to provide a federal forum.

The *Milliken* Court, for similar reasons, rejected a Tenth Amendment challenge to the order. 433 U. S., at 291. In short, "[t]he theme that thus emerges from [our recent *Young* cases] . . . is one of balancing of state and federal interests." *Pennsylvania* v. *Union Gas Co.*, 491 U. S., at 27 (STEVENS, J., concurring).

This case-by-case approach to the *Young* doctrine has been evident from the start. Before *Larson* v. *Domestic and Foreign Commerce Corp.*, 337 U. S. 682 (1949) (a federal sovereign immunity case), we allowed suits to proceed, as explained above, if the official committed a tort as defined by the common law. While *Larson* rejected this reliance on the common law of torts, see *id.*, at 692–695, the importance of case-by-case analysis was recognized again in *Seminole Tribe*. There, in holding the *Young* exception inapplicable to a suit based on federal law, we relied on *Schweiker* v. *Chilicky*, 487 U. S. 412 (1988). *Chilicky*, in turn, addressed whether a *Bivens* type of action, a right of action stemming from the Constitution itself, see *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), applied in a suit alleging due process violations in the denial of Social Security disability benefits. A *Bivens* action was unavailable, the *Chilicky* Court held, given the particular circumstances present in the case. *Seminole Tribe*'s implicit analogy of *Young* to *Bivens* is instructive. Both the *Young* and *Bivens* lines of cases reflect a sensitivity to varying contexts, and courts should consider whether there are "special factors counselling hesitation," 403 U. S., at 396, before allowing a suit to proceed under either theory. The range of concerns to be considered in answering this inquiry is broad. See *id.*, at 407 (Harlan, J., concurring).

As no one disputes, the *Young* fiction is an exercise in line-drawing. There is no reason why the line cannot be drawn to reflect the real interests of States consistent with the clarity and certainty appropriate to the Eleventh Amendment's jurisdictional inquiry.

## III

We now turn to consider whether the Tribe may avoid the Eleventh Amendment bar and avail itself of the *Young* exception. Although the "difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night," *Edelman*, 415 U. S., at 667, this suit, we decide, falls on the Eleventh Amendment side of the line, and Idaho's sovereign immunity controls.

The Tribe has alleged an ongoing violation of its property rights in contravention of federal law and seeks prospective injunctive relief. The Tribe argues that it should therefore be able to avail itself of the *Ex parte Young* fiction. Moreover, the Tribe points to the plurality decision in *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S. 670 (1982) (opinion of STEVENS, J.), where we allowed a Federal District Court to issue a warrant commanding state officials to turn over various artifacts (mainly treasure from a sunken Spanish galleon) to the United States Marshal despite the State's claim of sovereign immunity.

An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction. However, this case is unusual in that the Tribe's suit is the functional equivalent of a quiet title action which implicates special sovereignty interests. We do not think *Treasure Salvors, supra,* is helpful to the Tribe because the state officials there were acting beyond the authority conferred upon them by the State, *id.,* at 696–697, a theory the Tribe does not even attempt to pursue in the case before us. We must examine the effect of the Tribe's suit and its impact on these special sovereignty interests in order to decide whether the *Ex parte Young* fiction is applicable.

It is common ground between the parties, at this stage of the litigation, that the Tribe could not maintain a quiet title suit against Idaho in federal court, absent the State's con-

sent.   The Eleventh Amendment would bar it.   *Tindal*, 167 U. S., at 223.   Despite this prohibition, the declaratory and injunctive relief the Tribe seeks is close to the functional equivalent of quiet title in that substantially all benefits of ownership and control would shift from the State to the Tribe.   This is especially troubling when coupled with the far-reaching and invasive relief the Tribe seeks, relief with consequences going well beyond the typical stakes in a real property quiet title action.   The suit seeks, in effect, a determination that the lands in question are not even within the regulatory jurisdiction of the State.   The requested injunctive relief would bar the State's principal officers from exercising their governmental powers and authority over the disputed lands and waters.   The suit would diminish, even extinguish, the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory.   To pass this off as a judgment causing little or no offense to Idaho's sovereign authority and its standing in the Union would be to ignore the realities of the relief the Tribe demands.

Any contention that the State is not implicated by the suit in a manner having an immediate effect on jurisdictional control over important public lands is belied by the complaint itself.   The state officials who are the named defendants, all members of the Board of Land Commissioners save Director Higginson, include: Governor Cecil Andrus, who is Chairman of the Board and trustee of a public water right in Lake Coeur d'Alene pursuant to Idaho Code § 67–4304 (1989); Pete Cenarrusa, Secretary of State; Larry EchoHawk, Attorney General; Jerry Evans, Superintendent of Public Instruction; J. D. Williams, Auditor; and Keith Higginson, Director of the Department of Water Resources.   The power to regulate and control the use and disposition of public lands, including the beds of navigable lakes, rivers, and streams, is vested in the Board of Land Commissioners.   Idaho Const., Art. IX,

§ 7 (Supp. 1996); Idaho Code §§ 58–101, 58–104(9) (1994 and Supp. 1996).

Not only would the relief block all attempts by these officials to exercise jurisdiction over a substantial portion of land but also would divest the State of its sovereign control over submerged lands, lands with a unique status in the law and infused with a public trust the State itself is bound to respect. As we stressed in *Utah Div. of State Lands* v. *United States*, 482 U. S. 193, 195–198 (1987), lands underlying navigable waters have historically been considered "sovereign lands." State ownership of them has been "considered an essential attribute of sovereignty." *Id.*, at 195. The Court from an early date has acknowledged that the people of each of the Thirteen Colonies at the time of independence "became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government." *Martin* v. *Lessee of Waddell*, 16 Pet. 367, 410 (1842). Then, in *Lessee of Pollard* v. *Hagan*, 3 How. 212 (1845), the Court concluded that States entering the Union after 1789 did so on an "equal footing" with the original States and so have similar ownership over these "sovereign lands." *Id.*, at 228–229. In consequence of this rule, a State's title to these sovereign lands arises from the equal footing doctrine and is "conferred not by Congress but by the Constitution itself." *Oregon ex rel. State Land Bd.* v. *Corvallis Sand & Gravel Co.*, 429 U. S. 363, 374 (1977). The importance of these lands to state sovereignty explains our longstanding commitment to the principle that the United States is presumed to have held navigable waters in acquired territory for the ultimate benefit of future States and "that disposals by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or

otherwise made very plain." *United States* v. *Holt State Bank,* 270 U. S. 49, 55 (1926).

The principle which underlies the equal footing doctrine and the strong presumption of state ownership is that navigable waters uniquely implicate sovereign interests. The principle arises from ancient doctrines. See, *e. g.*, Institutes of Justinian, Lib. II, Tit. I, § 2 (T. Cooper transl. 2d ed. 1841) ("Rivers and ports are public; hence the right of fishing in a port, or in rivers are in common"). The special treatment of navigable waters in English law was recognized in Bracton's time. He stated that "[a]ll rivers and ports are public, so that the right to fish therein is common to all persons. The use of river banks, as of the river itself, is also public." 2 H. Bracton, De Legibus et Consuetudinibus Angliae 40 (S. Thorne transl. 1968). The Magna Carta provided that the Crown would remove "all fish-weirs . . . from the Thames and the Medway and throughout all England, except on the sea coast." M. Evans & R. Jack, Sources of English Legal and Constitutional History 53 (1984); see also *Waddell, supra,* at 410–413 (tracing tidelands trusteeship back to Magna Carta).

The Court in *Shively* v. *Bowlby,* 152 U. S. 1, 13 (1894), summarizing English common law, stated:

> "In England, from the time of Lord Hale, it has been treated as settled that the title in the soil of the sea, or of arms of the sea, below ordinary high water mark, is in the King; except so far as an individual or a corporation has acquired rights in it by express grant, or by prescription or usage . . . and that this title, *jus privatum,* whether in the King or in a subject, is held subject to the public right, *jus publicum,* of navigation and fishing."

Not surprisingly, American law adopted as its own much of the English law respecting navigable waters, including the principle that submerged lands are held for a public purpose.

See *Arnold* v. *Mundy*, 6 N. J. L. 1 (1821). A prominent example is *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 387 (1892), where the Court held that the Illinois Legislature did not have the authority to vest the State's right and title to a portion of the navigable waters of Lake Michigan in a private party even though a proviso in the grant declared that it did not authorize obstructions to the harbor, impairment of the public right of navigation, or exemption of the private party from any act regulating rates of wharfage and dockage to be charged in the harbor. An attempted transfer was beyond the authority of the legislature since it amounted to abdication of its obligation to regulate, improve, and secure submerged lands for the benefit of every individual. *Id.*, at 455–460. While *Illinois Central* was "necessarily a statement of Illinois law," *Appleby* v. *City of New York*, 271 U. S. 364, 395 (1926), it invoked the principle in American law recognizing the weighty public interests in submerged lands.

American law, in some ways, enhanced and extended the public aspects of submerged lands. English law made a distinction between waterways subject to the ebb and flow of the tide and large enough to accommodate boats (royal rivers) and nontidal waterways (public highways). With respect to the royal rivers, the King was presumed to hold title to the riverbed and soil while the public retained the right of passage and the right to fish. With public highways, as the name suggests, the public retained the right of passage, but title was typically held by a private party. See J. Angell, A Treatise on The Common Law in relation to Water-Courses 14–18 (1824). The riparian proprietor was presumed to hold title to the stream to the center thread of the waters *(usque ad filum aquae)*, which accorded him the exclusive right of fishery in the stream and entitled him to compensation for any impairment of his right to the enjoyment of his property caused by construction. The State's obligation to pay compensation could result in substantial liability. *Shrunk* v. *Schuylkill*, 14 Serg. & Rawle 71, 80 (Pa.

1826). State courts, however, early on in Pennsylvania, South Carolina, Alabama, and North Carolina rejected the distinction and concluded the State presumptively held title regardless of whether the waterway was subject to the ebb and flow of the tide. See, *e. g.*, *Carson* v. *Blazer*, 2 Binn. 475 (Pa. 1810); *Cates* v. *Wadlington*, 1 McCord 580 (S. C. 1822); *Bullock* v. *Wilson*, 2 Port. 436 (Ala. 1835); *Collins* v. *Benbury*, 3 Iredell 277 (N. C. 1842); but see *Hooker* v. *Cummings*, 20 Johns. 90 (N. Y. 1822). And this Court in describing the concept of sovereign lands rejected the requirement that navigable waters need be affected by the tides. *Barney* v. *Keokuk*, 94 U. S. 324, 337–338 (1877); cf. *Propeller Genesee Chief* v. *Fitzhugh*, 12 How. 443 (1852).

American law, moreover, did not recognize the sovereign's rights of private property *(jus privatum)* that existed in England, apart from the public's rights to this land *(jus publicum)*. In England, for instance, the Crown had the exclusive right to hunt the "grand fishes," *e. g.*, whales and sturgeons, of the sea. J. Angell, A Treatise on the Right of Property in Tide Waters and in the Soil and Shores Thereof 18–19 (1847). There was a particular aversion to recognizing in States the Crown's *jus privatum* right to seize private structures on shores and marshes reclaimed from tidewaters. See J. Gould, A Treatise on the Law of Waters including Riparian Rights, and Public And Private Rights In Waters Tidal And Inland § 32 (2d ed. 1891). All these developments in American law are a natural outgrowth of the perceived public character of submerged lands, a perception which underlies and informs the principle that these lands are tied in a unique way to sovereignty.

Idaho views its interest in the submerged lands in similar terms. Idaho law provides: "Water being essential to the industrial prosperity of the state, and all agricultural development . . . its control shall be in the state, which, in providing for its use, shall equally guard all the various interests involved. All the waters of the state, when flowing in their

natural channels . . . are declared to be the property of the state." Idaho Code § 42–101 (1990). Title to these public waters is held by the State of Idaho in its sovereign capacity for the purpose of ensuring that it is used for the public benefit. *Poole* v. *Olaveson*, 82 Idaho 496, 503, 356 P. 2d 61, 65 (1960). There are specific statutory provisions concerning Lake Coeur d'Alene. The Lake is held in trust by the Governor for the people of the State of Idaho. The "preservation of [Lake Coeur d'Alene] for scenic beauty, health, recreation, transportation and commercial purposes [being] necessary and desirable for all the inhabitants of the state is hereby declared to be a beneficial use of such water." Idaho Code § 67–4304 (1989). The "lands belonging to the state of Idaho between the ordinary high and low water mark at [Lake Coeur d'Alene] . . . are hereby declared to be devoted to a public use in connection with the preservation of said lak[e] in [its] present condition as a health resort and recreation place for the inhabitants of the state." Idaho Code § 67–4305 (Supp. 1996).

Our recitation of the ties between the submerged lands and the State's own sovereignty, and of the severance and diminishment of state sovereignty were the declaratory and injunctive relief to be granted, is not in derogation of the Tribe's own claim. As the Tribe views the case, the lands are just as necessary, perhaps even more so, to its own dignity and ancient right. The question before us is not the merit of either party's claim, however, but the relation between the sovereign lands at issue and the immunity the State asserts.

It is apparent, then, that if the Tribe were to prevail, Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury. Under these particular and special circumstances, we find the *Young* exception inapplicable. The dignity and status of its statehood allow Idaho to rely on its Eleventh Amendment

immunity and to insist upon responding to these claims in its own courts, which are open to hear and determine the case.

The judgment of the Court of Appeals is reversed in part, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE SCALIA and JUSTICE THOMAS join, concurring in part and concurring in the judgment.

The Coeur d'Alene Tribe of Idaho seeks declaratory and injunctive relief precluding Idaho officials from regulating or interfering with its possession of submerged lands beneath Lake Coeur d'Alene. Invoking the doctrine of *Ex parte Young*, 209 U. S. 123 (1908), the Tribe argues that the Eleventh Amendment does not bar it from pursuing its claims against state officials in federal court. I agree with the Court that the Tribe's claim cannot go forward in federal court.

In *Young*, the Court held that a federal court has jurisdiction over a suit against a state officer to enjoin official actions that violate federal law, even if the State itself is immune from suit under the Eleventh Amendment. The *Young* doctrine recognizes that if a state official violates federal law, he is stripped of his official or representative character and may be personally liable for his conduct; the State cannot cloak the officer in its sovereign immunity. *Id.*, at 159–160. Where a plaintiff seeks prospective relief to end a state officer's ongoing violation of federal law, such a claim can ordinarily proceed in federal court. *Milliken* v. *Bradley*, 433 U. S. 267, 289–290 (1977). The doctrine is not, however, without limitations. A federal court cannot award retrospective relief, designed to remedy past violations of federal law. See *Edelman* v. *Jordan*, 415 U. S. 651, 668 (1974); *Green* v. *Mansour*, 474 U. S. 64, 68–69 (1985).

This case is unlike a typical *Young* action in two important respects. First, as the Tribe concedes, the suit is the functional equivalent of an action to quiet its title to the bed of Lake Coeur d'Alene. It asks a federal court to declare that the lands are for the exclusive use, occupancy, and enjoyment of the Tribe and to invalidate all statutes and ordinances purporting to regulate the lands. The Tribe could not maintain a quiet title action in federal court without the State's consent, and for good reason: A federal court cannot summon a State before it in a private action seeking to divest the State of a property interest. *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S. 670, 699–700 (1982) (plurality opinion); see *Ford Motor Co.* v. *Department of Treasury of Ind.*, 323 U. S. 459, 464 (1945). Second, the Tribe does not merely seek to possess land that would otherwise remain subject to state regulation, or to bring the State's regulatory scheme into compliance with federal law. Rather, the Tribe seeks to eliminate altogether the State's regulatory power over the submerged lands at issue—to establish not only that the State has no right to possess the property, but also that the property is not within Idaho's sovereign jurisdiction at all. We have repeatedly emphasized the importance of submerged lands to state sovereignty. Control of such lands is critical to a State's ability to regulate use of its navigable waters. *Utah Div. of State Lands* v. *United States*, 482 U. S. 193, 195 (1987).

The Tribe's claim to federal jurisdiction rests heavily on cases that, in my view, do not control here. The first is *Treasure Salvors*, in which a plurality concluded that a federal court could issue a warrant commanding Florida officials to release certain artifacts because the suit was not, in effect, a suit against the State. But the fact that the suit was permitted to proceed in *Treasure Salvors* does not advance our inquiry. The plurality's conclusion that the suit was not against the State was based on its view that state officials lacked any colorable basis under *state* law for claiming right-

ful possession of the artifacts. 458 U. S., at 692–697. Put another way, the plurality in *Treasure Salvors* would have permitted the suit to proceed not because the plaintiff's claim of title arguably rested on federal law, see *post*, at 311 (SOUTER, J., dissenting), but because state officials were acting beyond the authority conferred on them by the State, quite apart from whether their conduct also violated federal law. Because the Tribe does not pursue such a theory, *Treasure Salvors* provides little guidance here. In addition, whether or not the Court's ultimate holding in *Treasure Salvors* that the suit should proceed remains sound on the theory that the plaintiff identified a federal law basis for its claim of title, see *post*, at 307, n. 9 (SOUTER, J., dissenting), the only reasoning *explicitly* offered by the *Treasure Salvors* plurality was narrowed by our subsequent decision in *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 106 (1984) (plaintiff cannot invoke *Young* doctrine based solely on alleged violation of state law); see 465 U. S., at 114, n. 25.

Second, the Tribe invokes a series of cases in which plaintiffs successfully pursued in federal court claims that federal and state officials wrongfully possessed certain real property. See, *e. g.*, *United States* v. *Lee*, 106 U. S. 196 (1882); *Tindal* v. *Wesley*, 167 U. S. 204 (1897). In both *Lee* and *Tindal*, the Court made clear that the suits could proceed against the officials because no judgment would bind the State. It was possible, the Court found, to distinguish between *possession* of the property and *title* to the property. See *Lee, supra*, at 222; *Tindal, supra*, at 223–224. A court could find that the officials had no right to remain in possession, thus conveying all the incidents of ownership to the plaintiff, while not formally divesting the State of its title. As noted, however, this case does not concern ownership and possession of an ordinary parcel of real property. When state officials are found to have no right to possess a disputed parcel of land, the State nevertheless retains its authority to

regulate uses of the land. Here, the Tribe seeks a declaration not only that the State does not own the bed of Lake Coeur d'Alene, but also that the lands are not within the State's sovereign jurisdiction. Whatever distinction can be drawn between possession and ownership of real property in other contexts, it is not possible to make such a distinction for submerged lands. For this reason, *Lee, Tindal,* and analogous cases do not control here. In my view, because a ruling in the Tribe's favor, in practical effect, would be indistinguishable from an order granting the Tribe title to submerged lands, the *Young* exception to the Eleventh Amendment's bar is not properly invoked here.

While I therefore agree that the Tribe's suit must be dismissed, I believe that the principal opinion is flawed in several respects. In concluding that the Tribe's suit cannot proceed, the principal opinion reasons that federal courts determining whether to exercise jurisdiction over any suit against a state officer must engage in a case-specific analysis of a number of concerns, including whether a state forum is available to hear the dispute, what particular federal right the suit implicates, and whether "special factors counse[l] hesitation" in the exercise of jurisdiction. *Ante,* at 274, 275, 278–280 (internal quotation marks omitted). This approach unnecessarily recharacterizes and narrows much of our *Young* jurisprudence. The parties have not briefed whether such a shift in the *Young* doctrine is warranted. In my view, it is not.

The principal opinion begins by examining this Court's early *Young* cases and concludes that the Court found the exercise of federal jurisdiction proper in those cases principally because no state forum was available to vindicate a plaintiff's claim that state officers were violating federal law. *Ante,* at 270–274. But the principal opinion cites not a single case in which the Court expressly relied on the absence of an available state forum as a rationale for applying *Young.* Instead, the principal opinion invokes language in

the Court's opinions suggesting that the plaintiff could not secure an adequate remedy *at law* in a state forum. See *Young*, 209 U. S., at 163; *Osborn* v. *Bank of United States*, 9 Wheat. 738, 838–846 (1824); *Lee, supra,* at 213, 219. But the inadequacy of a legal remedy is a prerequisite for equitable relief in any case. That we pronounced state legal remedies inadequate before permitting the suit to proceed is unsurprising, and it is not a sufficient basis for the principal opinion's broad conclusion.

Not only do our early *Young* cases fail to rely on the absence of a state forum as a basis for jurisdiction, but we also permitted federal actions to proceed even though a state forum *was* open to hear the plaintiff's claims. In fact, *Young* itself relied on two such cases, *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362 (1894), and *Smyth* v. *Ames*, 169 U. S. 466 (1898). See 209 U. S., at 153–155. Both *Reagan* and *Smyth*, like *Young*, involved challenges to state enforcement of railroad rates. In each case, the Court permitted the federal suit to proceed in part because state statutes authorized state court challenges to those rates. As *Young* made clear, however, the fact that the States had waived immunity in their own courts was not the sole basis for permitting the federal suit to proceed. Discussing *Reagan*, the *Young* Court stated: "This court held that [language authorizing a suit in state court] permitted a suit in [federal court], but it also held that, *irrespective of that consent, the suit was not in effect a suit against the State* (although the Attorney General was enjoined), and therefore not prohibited under the [Eleventh] [A]mendment. . . . *Each of these grounds is effective and both are of equal force.*" 209 U. S., at 153 (emphasis added). Similarly, the *Young* Court emphasized that the decision in *Smyth* was not based solely on the state statute authorizing suit in state court; rather, it was based on the conclusion that the suit "was not a suit against a State." 209 U. S., at 154.

In any event, as the principal opinion ultimately concedes, in more recent cases *Young* has been applied "[e]ven if there is a prompt and effective remedy in a state forum." *Ante,* at 274. When a plaintiff seeks prospective relief to end an ongoing violation of federal rights, ordinarily the Eleventh Amendment poses no bar. *Milliken,* 433 U. S., at 289–290. Yet the principal opinion unnecessarily questions this basic principle of federal law, finding it "difficult to say States consented to these types of suits in the plan of the Convention. . . . For purposes of the Supremacy Clause, it is simply irrelevant whether the claim is brought in state or federal court." *Ante,* at 274–275. We have frequently acknowledged the importance of having federal courts open to enforce and interpret federal rights. See *Green* v. *Mansour,* 474 U. S., at 68 ("[T]he availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law"); *Pennhurst,* 465 U. S., at 105 ("[T]he *Young* doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States. . . . Our decisions repeatedly have emphasized that the *Young* doctrine rests on the need to promote the vindication of federal rights" (citations and internal quotation marks omitted)). There is no need to call into question the importance of having federal courts interpret federal rights—particularly as a means of serving a federal interest in uniformity—to decide this case. Nor does acknowledging the interpretive function of federal courts suggest that state courts are inadequate to apply federal law.

In casting doubt upon the importance of having federal courts interpret federal law, the principal opinion lays the groundwork for its central conclusion: that a case-by-case balancing approach is appropriate where a plaintiff invokes the *Young* exception to the Eleventh Amendment's jurisdic-

tional bar, even when a complaint clearly alleges a violation of federal law and clearly seeks prospective relief. The principal opinion characterizes our modern *Young* cases as fitting this case-by-case model. *Ante*, at 278–280. While it is true that the Court has decided a series of cases on the scope of the *Young* doctrine, these cases do not reflect the principal opinion's approach. Rather, they establish only that a *Young* suit is available where a plaintiff alleges an *ongoing* violation of *federal* law, and where the relief sought is *prospective* rather than *retrospective*. Compare *Milliken, supra*, at 289–290, with *Green, supra*, at 68 (Eleventh Amendment bars notice relief where plaintiffs alleged no ongoing violation of federal law); *Pennhurst, supra*, at 106 (Eleventh Amendment bars suit alleging violation of state rather than federal law); *Edelman*, 415 U. S., at 668 (Eleventh Amendment bars relief for past violation of federal law).

The principal opinion properly notes that the Court found some of the relief awarded by the lower court in *Edelman*—an order requiring state officials to release and remit federal benefits—barred by the Eleventh Amendment. *Ante*, at 278; see *Edelman, supra*, at 668. It then states that the Court did not consider the propriety of other relief awarded below—an injunction requiring state officials to abide by federal requirements—because the State conceded that such relief was proper under *Young*. *Ante*, at 278. The principal opinion appears to suggest that the Court could have found such relief improper in the absence of this concession. But surely the State conceded this point because the law was well established. Indeed, *Edelman* is consistently cited for the proposition that prospective injunctive relief is available in a *Young* suit. See, *e. g.*, *Milliken, supra*, at 289. Similarly, by focusing on the Court's statement in *Quern* v. *Jordan*, 440 U. S. 332, 349 (1979), that the state officials did not object to preparing or sending notice of class members' possible remedies under state administrative procedures, *ante*, at 278–279, the principal opinion implies that the Court upheld

the prospective relief granted there because the relief was not particularly invasive. But the question in *Quern* was whether the notice relief was more like the prospective relief allowed in typical *Young* suits, or more like the retrospective relief disallowed in *Edelman*. 440 U. S., at 347. The *Quern* Court permitted the relief to stand not because it was inconsequential, but because it was adjudged prospective. Finally, the principal opinion explains this Court's decision in *Milliken*—which upheld an order requiring a State to pay for a comprehensive education for children who had been subjected to segregation—by focusing on the fact that the federal interests implicated by the claim in that case were particularly strong. *Ante*, at 279–280. Again, however, the Court upheld the relief not because the complaint sought to vindicate civil liberties, but because the remedy was prospective rather than retrospective. 433 U. S., at 289. Our case law simply does not support the proposition that federal courts must evaluate the importance of the federal right at stake before permitting an officer's suit to proceed.

Nor can I agree with the principal opinion's attempt to import the inquiry employed in *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), into our *Young* jurisprudence. *Ante*, at 280. In the *Bivens* context, where the issue is whether an implied remedy for money damages exists in a suit against a federal official for a constitutional violation, we have declined to recognize such a remedy where we have identified "special factors counselling hesitation." 403 U. S., at 396. In likening *Young* actions to *Bivens* actions, the principal opinion places great weight on a single citation in the Court's opinion last Term in *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996). There, relying on *Schweiker* v. *Chilicky*, 487 U. S. 412, 423 (1988), we noted that where Congress has created a remedial scheme for the enforcement of a federal right, we may not supplement that scheme in a suit against a federal officer with a judicially created remedy. We reasoned that the same general princi-

ple should apply in *Young* cases. That is, where Congress prescribes a detailed remedial scheme for enforcement of a statutory right, a court should not lift the Eleventh Amendment bar to apply its "full remedial powers" in a suit against an officer in a manner inconsistent with the legislative scheme. 517 U. S., at 75. The single citation to a *Bivens* case in *Seminole Tribe* by no means establishes that a case-by-case balancing approach to the *Young* doctrine is appropriate or consistent with our jurisprudence.

In sum, the principal opinion replaces a straightforward inquiry into whether a complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective with a vague balancing test that purports to account for a "broad" range of unspecified factors. *Ante*, at 280. In applying that approach here, the principal opinion relies on characteristics of this case that do not distinguish it from cases in which the *Young* doctrine is properly invoked, such as the fact that the complaint names numerous public officials and the fact that the State will have a continuing interest in litigation against its officials. *Ante*, at 269–270, 282–283. These factors cannot supply a basis for deciding this case. Every *Young* suit names public officials, and we have never doubted the importance of state interests in cases falling squarely within our past interpretations of the *Young* doctrine.

While I do not subscribe to the principal opinion's reformulation of the appropriate jurisdictional inquiry for all cases in which a plaintiff invokes the *Young* doctrine, I nevertheless agree that the Court reaches the correct conclusion here. The *Young* doctrine rests on the premise that a suit against a state official to enjoin an ongoing violation of federal law is not a suit against the State. Where a plaintiff seeks to divest the State of all regulatory power over submerged lands—in effect, to invoke a federal court's jurisdiction to quiet title to sovereign lands—it simply cannot be said that the suit is not a suit against the State. I would not narrow

our *Young* doctrine, but I would not extend it to reach this case. Accordingly, I join Parts I, II–A, and III of the Court's opinion.

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

Congress has implemented the Constitution's grant of federal-question jurisdiction by authorizing federal courts to enforce rights arising under the Constitution and federal law. The federal courts have an obligation to exercise that jurisdiction, and in doing so have applied the doctrine of *Ex parte Young*, 209 U. S. 123 (1908), that in the absence of some congressional limitation a federal court may entertain an individual's suit to enjoin a state officer from official action that violates federal law. The Coeur d'Alene Tribe of Idaho claims that officers of the State of Idaho are acting to regulate land that belongs to the Tribe under federal law, and the Tribe prays for declaratory and injunctive relief to halt the regulation as an ongoing violation of that law.[1] The Tribe's suit falls squarely within the *Young* doctrine, and the District Court had an obligation to hear it.

The response of today's Court, however, is to deny that obligation. The principal opinion would redefine the doctrine, from a rule recognizing federal jurisdiction to enjoin state officers from violating federal law to a principle of equitable discretion as much at odds with *Young*'s result as with the foundational doctrine on which *Young* rests. JUSTICE O'CONNOR charts a more limited course that wisely rejects the lead opinion's call for federal jurisdiction contingent on case-by-case balancing, but sets forth a rule denying jurisdiction here on Eleventh Amendment grounds because the

---

[1] The Tribe originally sought to quiet its claim of title as against the State itself, but the claim was dismissed as barred by the Eleventh Amendment, see 42 F. 3d 1244, 1254 (CA9 1994), and we denied certiorari to review the dismissal. See 517 U. S. 1133 (1996).

Tribe's suit is said to be indistinguishable from one to quiet title to the submerged lands and could leave the State not only without possession of the lands but without present opportunity to regulate them under state law. The Tribe's suit, however, is no more (or less) against the State than any of the claims brought in our prior cases applying *Young*, and the State's regulatory authority would be no more imposed upon than the State's authority in *Young* itself.

While there is reason for great satisfaction that JUSTICE O'CONNOR's view is the controlling one, it is still true that the effect of the two opinions is to redefine and reduce the substance of federal subject-matter jurisdiction to vindicate federal rights. And it is indeed substance, not form, that is here at stake, for this case comes on the heels of last Term's fundamentally erroneous decision in *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996). Consequently, if an individual or Indian tribe may not enter a federal court to obtain relief against state officers for violating federally derived property rights, that private plaintiff simply may seek no relief in a federal forum.

I respectfully dissent.

I

In *Seminole Tribe*, the Court declared *Ex parte Young* inapplicable to the case before it, having inferred that Congress meant to leave no such avenue of relief open to those claiming federal rights under the statute then under consideration. See *Seminole Tribe, supra*, at 73–76. The Court left the basic tenets of *Ex parte Young* untouched, however, see *Seminole Tribe, supra*, at 71–75, nn. 14, 16, 17, and Congress remained free to remove any bar to the invocation of *Young*, even in a successive suit by petitioners in *Seminole Tribe* itself.

When Congress has not so displaced the *Young* doctrine, a federal court has jurisdiction in an individual's action against state officers so long as two conditions are met. The plaintiff must allege that the officers are acting in violation of

federal law,[2] see *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S. 89, 106 (1984), and must seek prospective relief to address an ongoing violation, not compensation or other retrospective relief for violations past. See *Green* v. *Mansour,* 474 U. S. 64, 68 (1985); *Quern* v. *Jordan,* 440 U. S. 332, 346–349 (1979); *Edelman* v. *Jordan,* 415 U. S. 651, 664–671 (1974). The Tribe's claim satisfies each condition.

## A

The sources of federal law invoked by the Tribe go back to November 8, 1873, when President Grant issued an Executive Order establishing a reservation in the Idaho Territory for the Coeur d'Alene Tribe. See 1 C. Kappler, Indian Affairs: Laws and Treaties 837 (1904). The Tribe claims that the Executive Order, later ratified by Congress, see Act of Mar. 3, 1891, ch. 543, § 19, 26 Stat. 1026–1029, gave it the beneficial interest, subject only to the trusteeship of the United States, in the beds and banks of all navigable water within the reservation, including the submerged land under Lake Coeur d'Alene. See Complaint ¶¶ 19, 24.[3] In complaining that regulatory actions by the petitioner state officers violate the Tribe's right to exclusive use and occupancy of the submerged lands, the Tribe thus claims that they are acting in violation of controlling federal legal authority; since such federal authority happens to be necessary for any valid regulation of Lake Coeur d'Alene's submerged lands and

---

[2] The principal opinion suggests without citation that "in the plan of the Convention" the States may not have consented to suits in federal courts against state officers that rest on the interpretation of federal law. *Ante,* at 274. Because a suit against a state officer to enjoin an ongoing violation of federal law is not a suit against a State, the scope of state consent to suit at the founding has no bearing on the availability of officer suits under *Young.*

[3] The Tribe also claims to hold unextinguished aboriginal title to the lands, a claim not passed on below, but which we have recognized is based on federal law. See generally *Oneida Indian Nation of N. Y.* v. *County of Oneida,* 414 U. S. 661 (1974).

navigable waters, the Tribe in effect claims that petitioners are acting ultra vires as a matter of federal law. Petitioners join issue on just this point, in alleging that the submerged lands were not conveyed by the Executive Order or its ratification but instead passed to Idaho under the equal footing doctrine when Idaho became a State in 1890. Brief for Petitioners 14. While petitioners, as members of the state board of land commissioners, claim to be implementing the law of Idaho in regulating the submerged lands and waters of Lake Coeur d'Alene as a recreational area and health resort, see Idaho Code §§ 58-104(9) (Supp. 1996), 67-4304 (1989), 67-4305 (Supp. 1996), they agree with the Tribe that title to the submerged lands is controlled by federal law. See Brief for Petitioners 25. The Tribe asked the District Court to enjoin the state officers from "taking any actions or enforcing any State statutes, ordinances, regulations, customs or usages which cause [the Tribe and its members] to be deprived of their rights and privileges of exclusive use and occupancy to all beds and banks of all navigable water courses and all waters within the 1873 Coeur d'Alene Reservation boundaries." Complaint ¶ 35.

This is a perfect example of a suit for relief cognizable under *Ex parte Young*. *Young* described the officials' act on the basis of which jurisdiction was found in that case "simply [as] an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional. . . . The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." 209 U. S., at 159–160. Later cases have made it clear that a state official's act is also ultra vires for purposes of the *Young* doctrine when it violates other valid federal law. See, *e. g., Larson v. Domestic and Foreign Commerce Corp.*, 337 U. S. 682, 698–699 (1949). Such an illegal act amounting to ultra vires action is, of course, what the Tribe claims here.

This case, to be sure, differs from *Young* in two respects, but neither of them affects the Tribe's jurisdictional position. First, the Tribe's claim to have federal law on its side rests upon combined executive and congressional action, not the National Constitution. If the Tribe is right that the National Government conveyed the submerged lands to the Tribe prior to Idaho's admission to statehood, the officials' action is just as devoid of any valid basis as the acts found to be void for unconstitutionality in *Young*. See *Florida Dept. of State* v. *Treasure Salvors, Inc.*, 458 U. S. 670, 675–676, and n. 5, 695–697 (1982) (opinion of STEVENS, J.) (officer suit may proceed where state officers are acting in violation of federal statutory law); see also *Larson, supra,* at 698–699.

The second difference from *Young* is that this case turns on federal law governing passage of title to property; but a government's assumption of title to property is no different from its assumption of any state authority that it may ultimately turn out not to have. That a claim involves title is thus irrelevant under *Young* and has never been treated otherwise. Not only has a title claim never displaced *Young* so as to render state officials immune to suit by a rival claimant, see, *e. g., Treasure Salvors, supra,* but long before *Young* had even been decided *United States* v. *Lee,* 106 U. S. 196 (1882), held federal officers to be subject to a possessory action for land claimed by the United States on the basis of federal law. Since for purposes of *Young* Idaho and its officials claiming title under federal law are in the same posture as the United States and its officers in *Lee,* the appropriate analysis is the one exemplified in that case. See also *Tindal* v. *Wesley,* 167 U. S. 204, 213 (1897) ("[I]t cannot be doubted that the question whether a particular suit is one against the State, within the meaning of the Constitution, must depend upon the same principles that determine whether a particular suit is one against the United States").

In *Lee,* the Court held there was federal jurisdiction over an ejectment suit brought by General Lee's son to oust fed-

eral officers from property seized by the United States for alleged nonpayment of taxes and held under an order of the. Secretary of War. The defending officials claimed the "absolute immunity from judicial inquiry of every one who *asserts* authority from the executive branch of the government, however clear it may be made that the executive possessed no such power," 106 U. S., at 220 (emphasis in original), but they lost. The Court rejected the proposition that possession of property by federal officers on behalf of the United States sufficed to immunize the officers from a possessory action brought by a private citizen.[4] Lee's suit is seen today as deciding a claim that the officials involved were acting wholly without authority as a matter of constitutional law, since they were barred from dealing with the property by the Government's failure to pay the just compensation required by the Fifth Amendment. See *Larson, supra,* at 697.

*Lee* thus illustrates that an issue of property title is no different from any other legal or constitutional matter that may have to be resolved in deciding whether the officer of an immune government is so acting beyond his authority as to be amenable to suit without necessarily implicating his government. See *Treasure Salvors, supra,* at 676, 695–697 (opinion of STEVENS, J.) (like this case, involving state officials' reliance on federal law); see also *Tindal, supra,* at 222.[5] Indeed, the decisions of this Court have so held or assumed as far back as the time of Chief Justice Marshall's statement in *United States* v. *Peters,* 5 Cranch 115, 139–140 (1809), that "it certainly can never be alleged, that a mere suggestion of title in a state to property, in possession of an individual,

---

[4] The title claims in this case turn not on a constitutional issue but on federal title law; this makes no difference under *Young.* See *Larson* v. *Domestic and Foreign Commerce Corp.,* 337 U. S. 682, 698–699 (1949).

[5] Whether *Tindal* is, or must be, amenable to analysis as a federal ultra vires case we need not now decide; its holding that property title is irrelevant to jurisdictional analysis is not open to question. See 167 U. S., at 222–223.

must arrest the proceedings of the court, and prevent their looking into the suggestion, and examining the validity of the title." The contrary rule, *Lee* later explained, would "sanctio[n] a tyranny which has no existence in the monarchies of Europe, nor in any other government which has a just claim to well-regulated liberty and the protection of personal rights." *Lee, supra,* at 221. Thus did the Chief Justice foresee that governmental officials are not any the less amenable to suit for relying on their government's claim to property title, and no decision before today's would have turned the envious eyes of the old monarchs toward Idaho.

## B

The second condition for applying *Young* is that relief be prospective, not retrospective, a bar to future violations of federal law, not recompense for past mistakes. See *Edelman,* 415 U. S., at 664–666. The present complaint asks for just such relief by seeking to enjoin the State's sport and recreational regulation of the water covering the lands. It asks for no damages for past infringement of the tribal interest asserted and no accounting for fees previously collected by the State in the course of its regulatory oversight. While there would, of course, be significant consequences to the State if the Tribe should prevail on the merits, that will be true whenever *Young* applies. In *Young* itself, the State was left unable to enforce statutory railroad rate regulation or collect penalties from violators, and the *Young* doctrine has been held to apply even when compliance by the defendant officials will create a charge on the state treasury. The relief does not cease to be forward looking, nor is the suit transformed into one against the State itself, so long as its burden upon the State is merely a "necessary consequence of [the officers'] compliance in the future with a substantive federal-question determination." *Edelman, supra,* at 668. See also *Quern* v. *Jordan,* 440 U. S., at 337 (a "federal court, consistent with the Eleventh Amendment, may enjoin state

officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury"). However burdensome it may be to the State when its officers are ordered to stop violating federal law, it is not the cost of future compliance with federal law, but its character as such, that counts. See, *e. g.*, *id.*, at 347–349; *Milliken* v. *Bradley*, 433 U. S. 267, 288–290 (1977); *Edelman, supra*, at 664–668.[6] In this case, of course, the State has not identified any charge on its funds that might be comparable to the cost of compliance approved in *Edelman:* the consequence of any success the Tribe might ultimately have would simply be the end of a regulatory regime (including some fee income) that federal law would

---

[6] While the principal opinion suggests these cases embody a "careful balancing and accommodation of state interests when determining whether the *Young* exception applies in a given case," *ante*, at 278, in fact they simply reflect the Court's effort to demarcate the line between prospective and retrospective relief. That *Young* represents a "balance of federal and state interests," *Papasan* v. *Allain*, 478 U. S. 265, 277 (1986), does not mean the doctrine's application should be balanced against other factors in any given case. Instead, *Young*'s rule recognizing federal judicial power in suits against state officers to enjoin ongoing violations of federal law itself strikes the requisite balance between state and federal interests. Where these conditions are met, no additional "balancing" is required or warranted.

The principal opinion suggests that we held *Young* to apply in *Milliken* v. *Bradley*, 433 U. S. 267 (1977), because the complaint sought to vindicate civil liberties and accordingly involved strong federal interest. See *ante*, at 279. The undeniable federal interest in protecting civil liberties, however, was not the reason we applied the *Young* remedy in *Milliken*. The sole enquiry in this regard was whether the relief sought was fairly characterized as prospective. See 433 U. S., at 289 (noting that decree "fits squarely within the prospective-compliance exception reaffirmed by *Edelman*"). Given that we do not view a suit against a state officer for prospective relief as a suit against the State, the fact, as the majority in *Seminole Tribe* reaffirmed, see *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 59 (1996), that Congress may abrogate state immunity from suit in legislation enacted pursuant to § 5 of the Fourteenth Amendment has no bearing on *Young*'s application.

show the officers to lack any authority to maintain on the State's behalf.

What this straightforward analysis thus shows, precedent confirms. We have already seen that since the time of *Young*, as well as long before it, this Court has consistently held that a public officer's assertion of property title in the name of a government immune to suit cannot defeat federal jurisdiction over an individual's suit to be rid of interference with the property rights he claims. See, *e. g., Treasure Salvors*, 458 U. S., at 685–690 (opinion of STEVENS, J.); *Tindal*, 167 U. S., at 221–223; *Stanley* v. *Schwalby*, 162 U. S. 255, 270–271 (1896); *Lee*, 106 U. S., at 210. By a parity of reasoning, we have of course drawn the jurisdictional line short of ultimately quieting title (which would run directly against the State itself as putative title holder and not against its officers) or limiting the affected government in any subsequent quiet title action. "It is a judgment to the effect only that, as between the plaintiff and the defendants, the former is entitled to possession of the property in question, the latter having shown no valid authority to withhold possession from the plaintiff." *Tindal, supra,* at 223; see also *Lee, supra,* at 222. If dissatisfied with a federal court's interpretation of federal law in a suit against its officers, a State may itself subsequently "bring any action that may be appropriate to establish and protect whatever claim it has to the premises in dispute."[7] *Tindal, supra,* at 223; *Lee, supra,* at 222 ("[T]he government is always at liberty, notwithstanding any such judgment, to avail itself of all the remedies which the

---

[7] One option not available to the State here would be to condemn the lands outright. Federal law prevents the State from exercising eminent domain or otherwise acquiring tribal lands directly from the Tribe. See Rev. Stat. § 2116, 25 U. S. C. § 177. Efforts by state and local governments to regulate or acquire Indian lands accordingly may violate federal law, but cannot exact a taking. Tribes possess the right under federal common law to sue to enforce their possessory rights in land. *County of Oneida* v. *Oneida Indian Nation of N. Y.*, 470 U. S. 226, 235–236 (1985).

law allows to every person, natural or artificial, for the vindication and assertion of its rights"). See also *Treasure Salvors, supra*, at 688 (opinion of STEVENS, J.).[8]   This, of course, is a right that a State always has after an official has lost a *Young* suit, whatever its particular subject.

In sum, the Tribe seeks no damages or restitution to compensate for the State's exercise of authority over the land, nor does it ask for rescission of a past transfer of property. It says that state officers, by their continuing regulation, are committing an ongoing violation of federal law that may be halted by an injunction against the state officers.   If the Tribe were to prove what it claims, it would establish "precisely the type of continuing violation for which a remedy may permissibly be fashioned under *Young*." *Papasan* v. *Allain*, 478 U. S. 265, 282 (1986).

## II

### A

The first of the two points common to the opinions displacing *Ex parte Young* here is that this case pierces *Young*'s distinction between State and officer because the relief

---

[8] In this case, were the District Court to hold for the Tribe and conclude that federal law precludes state regulation, the Quiet Title Act, 28 U. S. C. § 2409a, may well preclude the State from bringing a subsequent action to quiet title to the land at issue, unless the United States consents to suit. This fact, however, has no bearing on *Young*'s application.   The absence of jurisdiction under the statute to entertain a suit where the Tribe would be the defendant says nothing about whether the Eleventh Amendment, as construed by this Court, bars a suit (*i. e.*, whether the State is the true defendant) where the Tribe is the plaintiff.   The two questions are simply independent of each other.   Nor (even assuming that the *Young* and sovereign immunity rules are convertible into doctrines of equity) does this state of affairs provide any equitable justification for foreclosing the Tribe's suit: a congressionally imposed limitation on federal-question jurisdiction is hardly a fault within the meaning of equity practice, see, *e. g.*, D. Dobbs, Law of Remedies § 2.4(2) (2d ed. 1993), and the Tribe, in any event, bears no responsibility for Congress's decision to enact the statute.

sought would be indistinguishable in practice from a decree quieting title. See *ante,* at 281 ("Tribe's suit is the functional equivalent of a quiet title action which implicates special sovereignty interests"); *ante,* at 282 (relief sought is "close to the functional equivalent of quiet title"); *ante,* at 289 (opinion of O'CONNOR, J.) ("suit is the functional equivalent of an action to quiet its title"). If this argument were to the point it would, to begin with, render erroneous the holdings in *Treasure Salvors,* for example, and *Lee* (as interpreted by *Larson,* 337 U. S., at 696–697).[9] In each of those cases, too, the individual plaintiffs' success against state officers was an aspersion on the government's claim of title. But a consideration of the alternatives shows why such aspersion was rightly accepted as a fair price to pay for the jurisdiction to consider individual claims of federal right in those two title cases, as it has been accepted generally. The one alternative, of settling the matter of title by compelling the State itself to appear in a federal-question suit, is barred by Eleventh Amendment doctrine. See, *e. g., Seminole Tribe,* 517 U. S., at 54; *Alabama* v. *Pugh,* 438 U. S. 781, 782 (1978) *(per curiam); Chandler* v. *Dix,* 194 U. S. 590, 591 (1904). The

---

[9] JUSTICE O'CONNOR says that *Treasure Salvors* is inapposite because the plurality's discussion of the property claim there, in her view, focused on whether the state officials were acting ultra vires state-law authority, see *ante,* at 289–290. But the plurality's analysis in *Treasure Salvors* was not so limited, and noted that the plaintiff salvage company claimed that Florida state officials lacked authority to retain treasure recovered from the sunken galleon because the galleon had been found on submerged land belonging to the United States, not Florida, as determined under the Submerged Lands Act, § 2(b), 67 Stat. 29, 43 U. S. C. § 1301(b), and our decision in *United States* v. *Florida,* 425 U. S. 791 (1976). See *Treasure Salvors,* 458 U. S., at 676, and n. 5. While the plurality noted further that the company claimed that the state officials lacked authority under state law to retain the treasure, see *id.,* at 692–693, there was no question that the company claimed ownership of the treasure under federal law. Accordingly, I disagree both that *Treasure Salvors* is inapplicable and that its reasoning was "narrowed" by *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S. 89 (1984). Cf. *ante,* at 290 (opinion of O'CONNOR, J.).

other, of leaving an individual powerless to seek any federal remedy for violation of a federal right, would deplete the federal judicial power to a point the Framers could not possibly have intended, given a history of officer liability riding tandem with sovereign immunity extending back to the Middle Ages. See Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 18 (1963); Erlich, No. XII: Proceedings Against the Crown (1216–1377) pp. 28–29, in 6 Oxford Studies in Social and Legal History (P. Vinogradoff ed. 1921). The holdings in *Treasure Salvors* and *Lee*, like the holding that should obtain here, represent a line drawn short of such an extreme, and if the Court may curse it as formalistic so may any line be cursed that must be drawn somewhere between unacceptable extremes. In the title cases cited, as in any other such suit, the State could ultimately settle its title by choosing to litigate the disputed title once and for all; in most cases, of course, the State may choose its own forum, though in this instance it would need the permission of the United States, see n. 8, *supra.* (As that note previously explained, the fact that the United States is required to consent to such a suit against an Indian tribe has nothing to do with the doctrinal basis of *Young* and is hardly an inequity to the States when viewed historically. See n. 11, *infra.*) The line is a fair via media between the extremes.

What is equally significant, finally, is that an officer suit implicating title is no more or less the "functional equivalent" of an action against the government than any other *Young* suit. States are functionally barred from imposing a railroad rate found unconstitutional when enforced by a state officer; States are functionally barred from withholding welfare benefits when their officers have violated federal law on timely payment; States are functionally barred from locking up prisoners whom their wardens are told to release. There is nothing unique about the consequences of an officer suit

involving title, and if the Court's reasoning were good in a title case it would be good in any *Young* case.

## B

The second joint reason that commands a majority turns on the fact that something more than mere title would be affected if the Tribe were to prevail. As the principal opinion puts it, "[t]he suit seeks, in effect, a determination that the lands in question are not even within the regulatory jurisdiction of the State," *ante*, at 282, and state ownership of submerged lands "uniquely implicate[s] sovereign interests," *ante*, at 284, such that the injunction sought by the Tribe would have an unusual effect on the State's "dignity and status," *ante*, at 287. This is the same reason that JUSTICE O'CONNOR gives for concluding that *Lee* and *Tindal* are not controlling here. See *ante*, at 290–291. She points out that *Lee* and *Tindal* involved claims to land that remained subject to state regulation even after the government officers were held to lack possessory authority, while here, if the Tribe were to prevail, no such regulatory power would be retained given that the submerged lands would no longer be "within Idaho's sovereign jurisdiction." *Ante*, at 289.

While this point is no doubt correct, it has no bearing on *Young*'s application in this case. The relevant enquiry, as noted, is whether the state officers are exercising ultra vires authority over the disputed submerged lands. If they are, a federal court may enjoin their actions, even though such a ruling would place the land beyond Idaho's regulatory jurisdiction and accordingly deny state officers regulatory authority. Idaho indisputably has a significant sovereign interest in regulating its submerged lands, see *Utah Div. of State Lands* v. *United States*, 482 U. S. 193, 195 (1987), but it has no legitimate sovereign interest in regulating submerged lands located outside state borders.

If, indeed, there were any doubt that claims implicating state regulatory jurisdiction are as much subject to *Young*

as cases contesting the possession of property, the facts of *Ex parte Young* itself would suffice to place that doubt to rest. *Young* was a suit to enjoin a State's Attorney General from enforcing a state statute regulating railroad rates and threatening violators with heavy sanctions. One would have difficulty imagining a state activity any more central to state sovereignty than such economic regulation or any more expressive of its governmental character than the provision for heavy fines. A State obliged to choose between power to regulate a lake and lake bed on an Indian reservation and power to regulate economic affairs and punish offenders would not (knowing nothing more) choose the lake. Implications for regulatory jurisdiction, therefore, do nothing to displace *Ex parte Young.*

## III

The remaining points of exception are, as I understand, confined to the principal opinion.

## A

That opinion suggests that the line between officer and State may be dissolved for jurisdictional purposes because the state officials here were acting in accordance with state law in their administration of the disputed land: if state law purports to authorize the acts complained of, they are not unauthorized for purposes of discerning the line between officials and their State under the Eleventh Amendment. *Ante*, at 281, 286–287.

If compliance with state-law authority were a defense to a *Young* suit, however, there would be precious few *Young* suits. State-law compliance is in fact a characteristic circumstance of most cases maintained under *Young*, see, *e. g.*, *Edelman*, 415 U. S., at 655, which are brought not because the defendant officials are mavericks under state law but because the state law is claimed to violate federal law made controlling by the Supremacy Clause. *Young*, accordingly, made it clear from the start that in a federal-question suit

against a state official, action in violation of valid federal law was necessarily beyond the scope of any official authority, thus rendering the official an individual for Eleventh Amendment purposes and thus obviating an encroachment on the State's immunity. 209 U. S., at 159–160; see also *Pennhurst,* 465 U. S., at 102–103, 105; *Quern,* 440 U. S., at 337; *Scheuer* v. *Rhodes,* 416 U. S. 232, 237 (1974) (noting that since *Young,* "it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law").

In this case, indeed, the allusion to conformity with state law is doubly misplaced, for it is common ground here that state law is irrelevant if under federal law the combined executive and congressional action vested title to the submerged lands in the Tribe. Each party is claiming under federal law, and the only issue is whether the regulatory action by the state officials is authorized or ultra vires as judged under that federal law. The jurisdictional question is posed, in other words, just as if this were a suit against a federal officer, as in *Larson,* 337 U. S., at 701–702, and this case is essentially like *Treasure Salvors,* 458 U. S., at 675–676, and n. 5, 695–697, in which the outcome turned directly on title under federal law.

B

The principal opinion's next reason for displacing *Young* rests on its view that the declaratory and injunctive relief the Tribe seeks is functionally equivalent to a money judgment and thus would amount to an impermissibly retrospective remedy. "[I]f the Tribe were to prevail, Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury." *Ante,* at 287. The principal opinion's assumption, in other words, is that intrusiveness is retrospectivity, an equation false to customary language usage and antithetical under extant Eleventh

Amendment doctrine to probably every case decided under *Ex parte Young,* including the original. The exercise of *Young* jurisdiction for vindicating individual federal rights is necessarily "intrusive," simply because state officials sued under *Young* are almost always doing exactly what their States' legislative and administrative authorities intend them to do. The state officers in *Treasure Salvors* were expected to secure 25 percent of the treasure salvaged from a sunken galleon for the State of Florida; an order to bring the treasure before a federal court in admiralty was nothing if not a threat to the State's expectations and intrusive into its affairs. See 458 U. S., at 678–679, 694 (opinion of STEVENS, J.). So was the injunction requiring the issuance of welfare benefits within federally mandated time limits in *Edelman,* see 415 U. S., at 656–659; and the order to get out of Arlington Cemetery in *Lee,* see 106 U. S., at 197, 220–221; and the order barring enforcement of a rail rate regulation in *Young* itself, see 209 U. S., at 132; and any order granting relief in any federal habeas case, see, *e. g., Brennan* v. *Stewart,* 834 F. 2d 1248, 1252, n. 6 (CA5 1988). If intrusiveness were to be a limitation on *Young,* the limitation would be terminal.[10]

## C

A third reason proposed by the principal opinion in support of today's result is the supposedly supplemental character of federal-question jurisdiction under *Young,* subject to giving way whenever the private plaintiff would have entree

---

[10] Under existing statutes it would not be even a partial answer to say that Congress has the power under § 5 of the Fourteenth Amendment to abrogate state sovereign immunity, as to cases within the subject matter covered by the state habeas statute, 28 U. S. C. § 2254, and Rev. Stat. § 1979, 42 U. S. C. § 1983; habeas claims are directed to state officers, see 28 U. S. C. § 2243; States are not persons subject to suit under § 1983, see *Will* v. *Michigan Dept. of State Police,* 491 U. S. 58, 71 (1989); and in neither instance could Congress be said to have intended to abrogate an immunity arising under the Eleventh Amendment.

to a state forum able to grant the relief sought. But this is mistaken in theory and contrary to practice.

Federal-question jurisdiction turns on subject matter, not the need to do some job a state court may wish to avoid; it addresses not the adequacy of a state judicial system, but the responsibility of federal courts to vindicate what is supposed to be controlling federal law. See *Green* v. *Mansour*, 474 U. S., at 68 ("[T]he availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law"); *Pennhurst, supra,* at 105 ("[T]he *Young* doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States. . . . Our decisions repeatedly have emphasized that the *Young* doctrine rests on the need to promote the vindication of federal rights" (citations and internal quotation marks omitted)). See also *Haring* v. *Prosise*, 462 U. S. 306, 322–323 (1983) (rejecting proposed rule that would relegate certain § 1983 claims to state court in the face of the statute's basic policy of providing a federal forum for vindication of federal rights).[11]

---

[11] Many federal cases with nondiverse parties, of course, might well have been brought as state cases if state relief could reasonably have been expected. Section 1983, for example, reflects the "grave congressional concern that the state courts had been deficient in protecting federal rights." *Allen* v. *McCurry*, 449 U. S. 90, 98–99 (1980) (citations omitted). See also *Patsy* v. *Board of Regents of Fla.*, 457 U. S. 496, 503–507 (1982); American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts 168 (1968). And when the plaintiff suing the state officers has been an Indian tribe, the readiness of the state courts to vindicate the federal right has been less than perfect. Cf. *United States* v. *Kagama*, 118 U. S. 375, 384 (1886) ("Because of the local ill feeling, the people of the States where [the Indians] are found are often their deadliest enemies"); Comment, *Oneida Nation v. County of Oneida:* Tribal Rights of Action and the Indian Trade and Intercourse Act, 84 Colum. L. Rev. 1852, 1858–1859 (1984) ("State courts . . . were generally hostile to tribal plaintiffs,

Thus, it is hardly surprising that *Ex parte Young* itself gives no hint that the Court thought the relief sought in federal court was unavailable in the Minnesota state courts at the time. *Young,* indeed, relied on prior cases in which federal courts had entertained suits against state officers notwithstanding the fact, as the *Young* Court expressly noted, that state forums were available in which the plaintiffs could have vindicated the same claims. See 209 U. S., at 153–155 (citing *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362 (1894), and *Smyth* v. *Ames,* 169 U. S. 466 (1898)). *Reagan,* like *Young,* was a rate case, in which the plaintiffs sued the State's Railroad Commission and the State Attorney General in federal court, seeking to enjoin enforcement of the commission's rate order and any attempt by the State's Attorney General to recover penalties for its violation. Federal jurisdiction was exercised, even though a state statute authorized suit against the commission in state court. While it is true, as the principal opinion notes, see *ante,* at 274, that the opinion in *Reagan* reflects the then-prevalent view that state consent to suit in a state forum amounted to consent in the federal forum, see *Reagan, supra,* at 392; contra, *Smith* v. *Reeves,* 178 U. S. 436, 441 (1900) (rejecting that view), the *Reagan* Court permitted the suit to proceed in federal court not on the ground that the state statute authorized a state suit but regardless of that point. The Court viewed the case as one to enjoin state officers from enforcing a state statute in violation of federal law, remarking that it "cannot . . . in any fair sense be considered a suit against the State." 154 U. S., at 392. Likewise, in *Smyth,* the historic rate case, a state statute authorized suit in state court to

---

for often the states themselves were the primary violators of tribal land rights"); Clinton & Hotopp, Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Origins of the Eastern Land Claims, 31 Me. L. Rev. 17, 42–49 (1979) (describing the history of state evasions of the federal statutory restraint on alienations of Indian land and the federal response).

challenge the constitutionality of rates imposed on railroads, but the Court permitted the federal suit for injunctive relief against the State Attorney General to go forward on the ground that it was not against the State. See 169 U. S., at 518. Had that not been clear enough, the opinion in *Young* would explain that in *Smyth*, the Court "did not base its decision on that section [of state law authorizing suit in state court] when it held that a suit of the nature of that before it was not a suit against a State, although brought against individual state officers for the purpose of enjoining them from enforcing, either by civil proceeding or indictment, an unconstitutional enactment to the injury of the plaintiff's right." *Young, supra,* at 154.

Nor did the *Young* Court hint that some inadequacy of state remedies was tantamount to the unavailability of a state forum. See *ante,* at 271–274 (principal opinion). The opinion in *Young* and other cases did indeed include observations that remedies available at law might provide inadequate relief to an aggrieved plaintiff, and *Young* itself noted that the failure to comply with the state statute would result in criminal penalties and hefty fines. But these remarks about the severity of the sanctions supported the Court's conviction that an equitable remedy was appropriate, see *Young, supra,* at 148, 163–166; see also *Poindexter* v. *Greenhow,* 114 U. S. 270, 299 (1885), not that a state forum was unavailable or federal jurisdiction subject to state preemption.[12] The principal opinion's notion that availability of

---

[12] The principal opinion also appears to rest on a misreading of *Osborn* v. *Bank of United States,* 9 Wheat. 738 (1824), as holding that the officer suit could proceed only because a suit directly against the State was prohibited. See *ante,* at 272. Chief Justice Marshall never suggested that a suit against the officers "would be barred" if the State could be named. Instead, he made clear that since the suit would be allowed to proceed if the State could be made a party, it should be allowed to proceed in its absence. The Chief Justice wrote: "[I]t would be subversive of the best established principles to say that the laws could not afford the same remedies against the agent employed in doing the wrong, which they would

a state forum should have some bearing on the applicability of *Ex parte Young* is thus as much at odds with precedent as with basic jurisdictional principles.

There is one more strike against the principal opinion's assumption that there is some significance in the availability of a state forum. The day the Court decided *Young*, it also decided *General Oil Co.* v. *Crain*, 209 U. S. 211 (1908). *General Oil* reviewed an order of the Supreme Court of Tennessee dismissing a corporation's suit against a state officer for relief from what it claimed was his violation of the National Constitution. The state court had said it lacked jurisdiction in the matter after construing the suit as one against the State, which was immune as sovereign. This Court held the dismissal to be reversible error,[13] ruling as a matter of federal law that the suit could not have been construed as being against the State. See *id.*, at 226–228. State law conferring immunity on its officers could not, in other words, constitutionally excuse a state court of general jurisdiction from an obligation to hear a suit brought to enjoin a state official's action as exceeding his authority because unconstitutional.[14]

---

afford against him, could his principal be joined in suit." *Osborn*, 9 Wheat., at 843. And while the Court recognized the equitable remedy provided relief "more beneficial and complete than the law can give," *id.*, at 845, the Court did not suggest that a remedy in state court was absent, or that any significance attached to the availability of a state forum.

[13] The judgment was not actually reversed because the Court reached the previously unreviewed challenge to the official's action and found it meritless. See *General Oil Co.* v. *Crain*, 209 U. S., at 231.

[14] *General Oil*'s application is not limited to those cases in which a remedy in federal court is unavailable, notwithstanding the observation that state relief was required given the Eleventh Amendment bar to suit in federal court, *General Oil Co.* v. *Crain*, 209 U. S., at 226, since *Young* ensured that the federal courts would be open for injunctive claims just like those at issue in *General Oil*. See Fallon, The Ideologies of Federal Courts Law, 74 Va. L. Rev. 1141, 1209, n. 312 (1988) (sentences surrounding the references in *General Oil* to an unavailable federal forum make clear that "the crucial distinction determining the obligations of the state courts is not one involving the availability or nonavailability of federal judicial relief; it is, rather, 'between valid and invalid state laws, as determining'

Cf. *Martinez* v. *California*, 444 U. S. 277, 284 (1980) (state immunity statute cannot immunize an officer from a § 1983 suit in state court). The consequence is that in every case in which *Ex parte Young* supports the exercise of federal-question jurisdiction against a state officer, *General Oil* prohibits the declination of state jurisdiction over the same officer on state immunity grounds. Insofar as state-court jurisdiction would count against *Ex parte Young* in one case,[15] it would presumably count against it as heavily in every case.

---

whether the suit is one against the state . . . . Because a state cannot authorize its officers to behave unconstitutionally, official action pursuant to an invalid state law cannot be protected by sovereign immunity; and a state court cannot decline to exercise jurisdiction on this basis") (quoting *General Oil, supra,* at 226); Monaghan, Third Party Standing, 84 Colum. L. Rev. 277, 294, n. 97 (1984) ("[I]f prospective relief is a necessary concomitant of a federal right, availability of such relief in federal courts may not free the states from an obligation to provide it as well").

Nor was *General Oil* overruled or otherwise "abandoned" by *Georgia R. R. & Banking Co.* v. *Musgrove*, 335 U. S. 900 (1949), in which the Court dismissed an appeal from a decision of the Supreme Court of Georgia holding that state sovereign immunity barred suits asserting constitutional claims against state officials. Cf. 16B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4024, pp. 363–364 (2d ed. 1996). The one-paragraph *per curiam* dismissal in *Musgrove* stated that an adequate nonfederal ground supported the state court's decision but did not identify the state ground involved; the posture of the case suggests that the Court may have viewed the lower court's decision as based on a valid state law regarding the timing and not the existence of state remedies. See Fallon, *supra,* at 1211, n. 317.

Finally, insofar as *General Oil* may be read to require that States provide some adequate judicial remedy to redress acts of state officials that violate federal law, see, *e. g.,* Collins, Article III Cases, State Court Duties, and the Madisonian Compromise, 1995 Wis. L. Rev. 39, 164, n. 359, but not necessarily injunctive relief in particular, its relevance for our purposes remains the same, that is, that every litigant seeking prospective relief in federal court under *Young* may obtain some adequate redress in state court as well.

[15] Quite apart even from what *General Oil* may mandate, it appears that in all 50 States, as a matter of course, private plaintiffs may obtain declaratory and injunctive relief in state court for the acts of state officials in

318

## IV

None of the considerations that the principal opinion would weigh in the course of its balancing process in this

circumstances where relief would be available in federal court under *Young*. Some state courts have announced as a general rule that a suit seeking to enjoin acts by a state official that violate federal law, or are otherwise unauthorized, is not a suit against the State. See, *e. g., Aland v. Graham*, 287 Ala. 226, 229–230, 250 So. 2d 677, 679 (1971); *Etheredge v. Bradley*, 480 P. 2d 414, 416 (Alaska 1971); *Doe v. Heintz*, 204 Conn. 17, 31–32, 526 A. 2d 1318, 1326 (1987); *Georgia Public Service Comm'n v. Atlanta Gas Light Co.*, 205 Ga. 863, 869–874, 55 S. E. 2d 618, 623–625 (1949); *W. H. Greenwell, Ltd. v. Department of Land and Natural Resources*, 50 Haw. 207, 208–209, 436 P. 2d 527, 528 (1968); *Century Distilling Co. v. Defenbach*, 61 Idaho 192, 200–203, 99 P. 2d 56, 59–60 (1940); *Noorman v. Department of Public Works & Buildings*, 366 Ill. 216, 220–222, 8 N. E. 2d 637, 639, appeal dism'd, 302 U. S. 637 (1937); *Rockford Memorial Hospital v. Department of Human Rights*, 272 Ill. App. 3d 751, 754–758, 651 N. E. 2d 649, 653–655, appeal denied, 163 Ill. 2d 586, 657 N. E. 2d 638 (1995); *Collins v. State Bd. of Social Welfare*, 248 Iowa 369, 372–373, 81 N. W. 2d 4, 6 (1957); *Board of Trustees of the Univ. of Ky. v. Hayse*, 782 S. W. 2d 609, 616 (Ky. 1989), cert. denied, 497 U. S. 1025 and 498 U. S. 938 (1990); *Carso v. Board of Liquidation of State Debt*, 205 La. 368, 371–374, 17 So. 2d 358, 360 (1944); *Jones v. Maine State Highway Comm'n*, 238 A. 2d 226, 229–230 (Me. 1968); *Thompson v. Auditor General*, 261 Mich. 624, 628–630, 247 N. W. 360, 362 (1933); *L. K. v. Gregg*, 425 N. W. 2d 813, 818, n. 3 (Minn. 1988); *Kleban v. Missouri*, 363 Mo. 7, 15–17, 247 S. W. 2d 832, 837 (1952); *Rein v. Johnson*, 149 Neb. 67, 68–69, 30 N. W. 2d 548, 551–552 (1947), cert. denied, 335 U. S. 814 (1948); *Grinnell v. State*, 121 N. H. 823, 825–826, 435 A. 2d 523, 525 (1981); *Abelson's, Inc. v. New Jersey State Board of Optometrists*, 5 N. J. 412, 416–418, 75 A. 2d 867, 869 (1950); *Ramah Navaho School Bd. v. Bureau of Revenue*, 104 N. M. 302, 308, 720 P. 2d 1243, 1249 (Ct. App. 1986); *Carter v. City of Las Cruces*, 121 N. M. 580, 583, 915 P. 2d 336, 338 (Ct. App. 1996); *Corum v. University of North Carolina*, 330 N. C. 761, 771, and n. 3, 772, 413 S. E. 2d 276, 283, and n. 2 (1992); *Ennis v. Dasovick*, 506 N. W. 2d 386, 392 (N. D. 1993); *Schwarz v. Board of Trustees*, 31 Ohio St. 3d 267, 271–274, 510 N. E. 2d 808, 812–813 (1987); *Gast v. State*, 36 Ore. App. 441, 443–447, 585 P. 2d 12, 15–17 (1978); *Philadelphia Life Ins. Co. v. Commonwealth*, 410 Pa. 571, 574–577, 190 A. 2d 111, 113–114 (1963); *Ware Shoals Mfg. Co. v. Jones*, 78 S. C. 211, 216–219, 58 S. E. 811, 813 (1907); *White Eagle Oil & Refining Co. v. Gunderson*, 48 S. D. 608, 614–619, 205 N. W. 614, 617–618 (1925); *American*

case is a legitimate reason for questioning jurisdiction over the state officials, and nothing about property title or regulatory jurisdiction justifies the majority's exception to *Young's* guarantee of a federal forum to a private federal claimant against state officials.

*Trucking Associations, Inc.* v. *Conway,* 146 Vt. 579, 586–587, 508 A. 2d 408, 413 (1986); *State ex rel. Robinson* v. *Superior Court,* 182 Wash. 277, 281–284, 46 P. 2d 1046, 1049–1050 (1935); *Pittsburgh Elevator Co.* v. *West Va. Bd. of Regents,* 310 S. E. 2d 675, 685 (W. Va. 1983); *Wisconsin Fertilizer Assn.* v. *Karns,* 39 Wis. 2d 95, 100–102, 158 N. W. 2d 294, 297 (1968); *Oyler* v. *State,* 618 P. 2d 1042, 1047–1048 (Wyo. 1980).

Other States have permitted such suits to proceed without discussing the jurisdictional basis for the action. See, *e. g., Carroll* v. *Robinson,* 178 Ariz. 453, 458–459, 874 P. 2d 1010, 1015 (Ct. App. 1994); *Honor* v. *Yamuchi,* 307 Ark. 324, 330–332, 820 S. W. 2d 267, 271–272 (1991); *Endler* v. *Schutzbank,* 68 Cal. 2d 162, 180–182, 436 P. 2d 297, 310–311 (1968); *International Society for Krishna Consciousness, Inc.* v. *Colorado State Fair & Industrial Exposition Comm'n,* 199 Colo. 265, 268–269, 610 P. 2d 486, 489 (1980); *Gebhart* v. *Belton,* 33 Del. Ch. 144, 91 A. 2d 137 (1952), rev'd on other grounds, 349 U. S. 294 (1955); *Mercer* v. *Hemmings,* 170 So. 2d 33, 35 (Fla. 1964); *Libertarian Party of Florida* v. *Smith,* 660 So. 2d 807 (Dist. Ct. App. Fla. 1995); *Darling* v. *Kansas Water Office,* 245 Kan. 45, 52–54, 774 P. 2d 941, 947 (1989); *Gumbhir* v. *Kansas State Bd. of Pharmacy,* 231 Kan. 507, 512–515, 646 P. 2d 1078, 1084 (1982); *Secretary of State* v. *Bryson,* 244 Md. 418, 423–424, 428–429, 224 A. 2d 277, 280, 283 (1966); *Maryland Comm. for Fair Representation* v. *Tawes,* 228 Md. 412, 423–427, 439–440, 180 A. 2d 656, 662–663, 671 (1962); *Apkin* v. *Treasurer & Receiver General,* 401 Mass. 427, 428–430, 517 N. E. 2d 141, 141–142 (1988); *Wicks* v. *Mississippi Valley State Univ.,* 536 So. 2d 20 (Miss. 1988); *Orozco* v. *Day,* 934 P. 2d 1009, 1017 (Mont. 1997); *Northern Nevada Assn. of Injured Workers* v. *Nevada State Industrial Insurance System,* 107 Nev. 108, 115–116, 807 P. 2d 728, 733 (1991); *New York Central R. Co.* v. *Lefkowitz,* 12 N. Y. 2d 305, 309–310, 189 N. E. 2d 695, 697 (1963); *Owner-Operator Independent Drivers Assn.* v. *Anthony,* 879 P. 2d 845, 847–848 (Okla. Ct. App. 1994); *Retired Adjunct Professors of the State of Rhode Island* v. *Almond,* 690 A. 2d 1342, 1348 (R. I. 1997); *Riggs* v. *Burson,* 941 S. W. 2d 44 (Tenn. 1997); *Sanders* v. *State Dept. of Public Welfare,* 472 S. W. 2d 179, 183–184 (Ct. App. Tex. 1971), error dism'd (1972); *H. L.* v. *Matheson,* 604 P. 2d 907 (Utah 1979), aff'd, 450 U. S. 398 (1981); *State Bd. of Elections* v. *Forb,* 214 Va. 264, 265–266, 199 S. E. 2d 527, 528 (1973).