In re RICHMOND HEALTH CARE, INC. d/b/a Sunrise Health and Rehabilitation Center FEI: 58–1458286, Debtor.

Hillard Development Corporation, d/b/a Pilgrim Manor Nursing Home, d/b/a Provident Nursing Home, FEI: 58–1538435, Debtor.

Hillard Development Corporation, d/b/a Pilgrim Manor Nursing Home, d/b/a Provident Nursing Home, Plaintiff,

v.

Barbara Erban Weinstein, Commissioner, William D. O'leary, Secretary, and John Daley, Executive Secretary, The Commonwealth of Massachusetts, Executive Office of Health and Human Services, Division of Health Care Finance and Policy; Michael Berolini, Director, Audit, Compliance and Evaluation Group, The Commonwealth of Massachusetts, Executive Office of Health and Human Services, Division of Health Care Finance and Policy; Bruce M. Bullin, Director, Massachusetts Division of Medical Assistance; Rachel Richards, Director of Claims Operations, Division of Medical Assistance, The Commonwealth of Massachusetts; Stanford I. Chesler, as Attorney for the Division of Health Care Finance and Policy and Division of Medical Assistance, The Commonwealth of Massachusetts; and/or their Successors in Office, Defendants.

Bankruptcy Nos. 9825060–BKC–AJC, 98–25061–BKC–AJC.
Adversary No. 98–2370–BKC–AJC–A.

United States Bankruptcy Court, S.D. Florida, Fort Lauderdale Division.

Jan. 26, 2000.

James B. Boone, Fort Lauderdale, FL, for plaintiff.

Thomas O. Bean, Special Assistant Attorney General, Nutter, McClennan & Fish, Boston, MA,

Gregory S. Gilman, Assistant Attorney General, Boston, MA.

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS

A. JAY CRISTOL, Chief Judge.

**THIS CAUSE** came to be heard at a non-evidentiary hearing before this Court

on Defendant's *Motion to Dismiss* and Plaintiff's *Response in Opposition to Defendant's Motion to Dismiss.* The Court having reviewed the file, heard the arguments of counsel and being fully advised in the premises, denies the motion to dismiss.

### Background

The Court is quite familiar with the parties involved in the instant *Motion to Dismiss,* the unfortunate chain of events surrounding the filing of this adversary proceeding, and the Commonwealth's conduct which appears to thwart the debtor's numerous attempts to achieve a fresh start under the Bankruptcy Code.

Hillard Development Corporation ("Hillard" or "Plaintiff") initially appeared before this Court in a Chapter 11 case, Case No. 90–27588–BKC–AJC and in related adversary proceedings. Various state agencies of the Commonwealth of Massachusetts (the "Commonwealth" or "Commonwealth Agencies" or "Defendants") also appeared before this Court in that case. The Defendants were creditors of Hillard in Case No. 90–27588–BKC–AJC and filed proofs of claim with the Court. The Commonwealth waived any claim of sovereign immunity in that case under 11 U.S.C. § 106(a) by filing proofs of claim [1].

Hillard, with corporate headquarters in Sunrise, Florida, owns and operates two nursing homes in Massachusetts. Hillard commenced several adversary proceedings against the Commonwealth. The adversary proceedings were initiated against the Massachusetts Division of Medical Assistance ("DMA"), the Massachusetts Division of Healthcare Finance and Policy, successor agency to the Massachusetts Rate Setting Commission (the "DHCFP") and certain present and former commissioners of DMA and the DHCFP (collectively, the "Commonwealth Agencies").

The first adversary proceeding against the Commonwealth Agencies was Adv. No. 91–1197–BKC–AJC–A. On March 23, 1993, the Court entered an agreed order (the "Agreed Order") approving a settlement between the parties (the "Stipulation"), in Adv. No. 91–1197–BKC–AJC–A.

On May 27, 1994, Hillard filed a second adversary proceeding against the Commonwealth Agencies in Adv. No. 94–0467–BKC–AJC–A. Hillard's complaint alleged that the Commonwealth Agencies violated the Agreed Order in Adv. No. 91–1197–BKC–AJC–A. The Court conducted an evidentiary hearing and concluded that the Commonwealth Agencies had, as alleged, breached both the Stipulation and the Agreed Order. Thereafter, on October 6, 1996, the Court entered an *Order on Evidentiary Hearing* in Adv. Pro. No. 94–0467–BKC–AJC–A, which stated the Commonwealth violated the Stipulation entered into between the parties on March 18, 1993, as well as the Agreed Order entered by the Court. In addition, the Court held that the Commonwealth willfully and intentionally violated the Stipulation. Accordingly, the Court assessed damages in the amount of $1,004,340.98 and awarded sanctions in the amount of $1,004,340.98, with said sums to increase at the rate of $82,000.00 each month until paid in full. The Court thereupon entered a Final Judgment against the Commonwealth on October 30, 1996. The Commonwealth Agencies appealed the Final Judgment to the United States District Court for the Southern District of Florida and the United States District Court entered an order granting the Commonwealth Agencies' motion for stay pending appeal.

Subsequent to entering the *Order on Evidentiary Hearing* and the *Final Judgment* in Adv. No. 94–0467–BKC–AJC–A, the Court ordered the parties to attend mediation. Between August 1997 and No-

---

1. 11 U.S.C. § 106(a) provides that "[a] governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is proper- ty of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose."

vember 3, 1997, the parties had numerous conferences with Jeffrey Beck, Esq., the Court-appointed mediator for this case.

As a direct result of the mediation, several events occurred in late 1997 which ultimately formulated the basis of the instant adversary proceeding. On November 3, 1997, Hillard filed *Plaintiff's Emergency Motion for Authorization to Enter Into Settlement Agreement and Request for Emergency Hearing (if Required by Court)* (C.P. # 269 of Adv. No. 94–0467–BKC–AJC–A). The emergency motion explained the parties' desire to enter into a settlement agreement that would dispose of all claims which could have been raised by either litigant against the other arising out of events occurring at any time on or before November 3, 1997 (the "Settlement Agreement"). Specifically, the Settlement Agreement contained two basic components. First, the Commonwealth was required to pay $1,500,000.00 to an escrow agent, which sum would be released to the Debtor under certain terms. Second, the Commonwealth agreed to pay to Hillard the Medicaid claims submitted by the nursing homes in the ordinary course; *these Medicaid claims were to be paid under specifically agreed upon case mix category ("CMC") rates, as set forth in the Settlement Agreement.* An emergency hearing was held on November 3, 1997 and the Court entered an *Order Granting Plaintiff's Emergency Motion for Authorization to Enter Into Settlement Agreement* (C.P. # 270 of Adv. No. 94–0467–BKC–AJC–A). Prior to the Commonwealth executing the Settlement Agreement, the parties filed a *Joint Motion for Dismissal* (C.P. # 271 of Adv. No. 94–0467–BKC–AJC–A). An *Agreed Order of Dismissal* (C.P. # 272 of Adv. No. 94–0467–BKC–AJC–A) was entered on November 13, 1997. The Commonwealth thereafter executed the Settlement Agreement on or about November 19, 1997. The Settlement Agreement contained an Escrow Agreement, signed by the parties, which set forth certain requirements to be met by all parties with regard to the Settlement Agreement. Despite the specific requirements under the Settlement Agreement, the Commonwealth failed to remit the funds. Although Hillard complied with all of its requirements under the Escrow Agreement, the Commonwealth failed to make the escrow check payable to the escrow agent, costing Hillard $225.00 per day, and it failed to send the appropriate release letter to the escrow agent so that the agent could make the $1,500,000 payment to Hillard. Therefore, on November 26, 1997, the Debtor filed an *Emergency Motion to Compel Turnover of Funds Pursuant to Escrow Agreement, Motion for Sanctions, or Alternatively, Motion for Order to Show Cause Why Defendants and Their Counsel Should Not be Held in Contempt of Court (Emergency Hearing Requested).* (C.P. # 273 of Adv. No. 94–0467–BKC–AJC–A). The motion sought to compel the Commonwealth to provide Jeffrey Beck, Esq., escrow agent, with the requisite letter authorizing the release to Hillard of the $1,500,000 escrow funds. Hillard incurred legal fees in filing the emergency motion and appearing at an emergency hearing in order to compel the Commonwealth to do what it had already agreed to do in the Settlement Agreement. It appeared to the Court that the Commonwealth was again thwarting Debtor's attempts to reorganize its business under the Bankruptcy Code by refusing to make the agreed payment to Debtor. At the emergency hearing held on November 26, 1997, the Court ordered the turnover of the $1,500,000 escrow funds to Hillard.

During the course of Court-ordered mediation which resulted in the execution of the Settlement Agreement, the Debtor asserts Stanford I. Chesler, Esq., general counsel to the Division of Medical Assistance, assured Hillard the 1993 cost report would not be utilized as a base year for setting rates in the 1998 rate year. Prior to executing the Settlement Agreement, the Debtor claims that, based upon Mr. Chelser's representations, it instructed its accountants, Mullen and Company, to cal-

culate Medicaid rates for 1998 by utilizing the 1996 cost reports as amended. Hillard maintains that it was only after reviewing the accountants' calculations, which were based upon the rate calculations Attorney Chesler represented, did Hillard execute the Settlement Agreement.

But the Commonwealth continued to engage in shenanigans. On May 14, 1998, the Court held a hearing on *Plaintiff's Emergency Motion for Relief from Orders, Motion for Sanctions, and Request for Emergency Hearing* (C.P. # 276 of Adv. No. 94–0467–BKC–AJC–A) and *Defendants' Opposition to Plaintiff's Emergency Motion for Relief from Orders and for Sanctions* (C.P. # 278 of Adv. No. 94–0467–BKC–AJC–A). The Debtor asked the Court to vacate the orders entered on November 3, 1997 (*Order Granting Plaintiff's Emergency Motion for Authorization to Enter Into Settlement Agreement*, C.P. # 270 of Adv. No. 94–0467–BKC–AJC–A) and November 13, 1997 (*Agreed Order of Dismissal*, C.P. # 272 of Adv. No. 94–0467–BKC–AJC–A). Debtor asserted it was induced by fraud to enter into the Court-approved Settlement Agreement. The Plaintiff explained that by virtue of enacting specific legislation addressed to those matters contained in the Settlement Agreement, the Commonwealth of Massachusetts circumvented the obligations and compromises it agreed to under the Settlement Agreement. At the May 14, 1998 emergency hearing, Plaintiff attempted to admit into evidence certain statements made by Stanford I. Chesler, Defendant's attorney and mediation representative. However, the Court disagreed with the Plaintiff's interpretation of F.R.E. Rule 408 and determined that, under Rule 919 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida, Mr. Chesler's statements were inadmissible. The Court declined to set aside its orders based on these statements. Notwithstanding the inadmissibility of the statements and the Court's inability to grant Plaintiff the relief requested, the Court entered the *Order Denying,*

*Without Prejudice, Plaintiff's Motion for Relief from Orders and for Sanctions* (C.P. # 280 of Adv. No. 94–0467–BKC–AJC–A) on May 29, 1998. The order denied the relief Plaintiff sought, but detailed the egregious conduct of the Commonwealth. *In re The Hillard Development Corporation,* 221 B.R. 282, 283–284 (Bankr.S.D.Fla.1998). In particular, the Court stated:

> In an obviously evil attempt to circumvent what was to be a good faith resolution of the disputes between the parties, the Defendant enacted legislation which effectively cut the guts, the legs and the teeth out of the Settlement Agreement, and throws the Plaintiff right back to where it was before Plaintiff thought it had negotiated a deal with which it felt it could live. Throughout these proceedings the Defendant has acted with nothing less than malevolence and ill-will toward the Plaintiff, and the conduct of the Defendant at this stage can best be characterized as bad faith.
>
> Enacting legislation which circumvents the substance and intent of the Settlement Agreement has once again placed the Plaintiff in the position of financial ruin and possibly the end of its existence. Such legislation, apparently enacted after the settlement for the specific purpose of eliminating the benefits of the Settlement Agreement, has crushed this Debtor . . . .

221 B.R. at 283. The order suggested alternative remedies available to the Debtor, including the possibility of filing an adversary proceeding or filing a new bankruptcy case for the purpose of avoiding the Settlement Agreement as an executory contract.

The rate-setting legislation at issue, Massachusetts General Laws Chapter 99, Section 22 states, in pertinent part:

> Notwithstanding the provisions of any general or special law to the contrary, nursing facility prospective rates of payment established by the division of

health care finance and policy for 1998 may be established as of a different date than January 1 and may be developed using the costs of any year which said division, at its discretion and after public hearing, shall determine appropriate; provided, however, that in order to allow said division necessary time to complete its development and promulgation of the rate methodology for 1998, prospective rates of payment of nursing facility services established by said division ' for 1997 under 114.2 CMR 5.00 and such rates established for the period *including 1997 under a settlement agreement,* shall remain in effect for 1998 until 1998 rates shall be promulgated; and provided further, that said 1998 rates shall be paid for nursing facility services provided on or after February 1, 1998. (Emphasis added.)

It is not difficult to surmise the legislation was enacted to affect this particular debtor.

Subsequent to the Court's May 29, 1998 order, Debtor filed a new Chapter 11 case on July 20, 1998, Case No. 98–25061–BKC–AJC. Thereafter, Debtor filed a *Motion to Reject the Settlement Agreement as an Executory Contract.* The Commonwealth objected on jurisdictional grounds.

The Debtor initiated Adv. No. 98–2370–BKC–AJC–A against the Commonwealth on November 3, 1998. The Commonwealth did not file an answer to the adversary complaint. It has not filed any proofs of claim in this proceeding and has stated on the record there is no intention to do so. (C.P. # 11 of Adv. No. 98–2370–BKC–AJC–A, p. 7, lines 11–13). Instead, the Commonwealth filed a *Limited Appearance of the Commonwealth of Massachusetts and Motion to Dismiss* (C.P. # 5 in Adv. No. 98–2370–BKC–AJC–A) together with a *Limited Appearance of the Commonwealth of Massachusetts and Memorandum of Law in Support of Motion to Dismiss* (C.P. # 6 in Adv. No. 98–2370–BKC–AJC–A). Although the Common-

wealth has vigorously defended itself for almost one decade in this Court, and there exists no new substantive facts, the Commonwealth suddenly contends this Court lacks jurisdiction to grant any of the relief requested in Hillard's complaint. The Commonwealth asserts its immunity under the Eleventh Amendment to the United States Constitution and seeks to have the adversary proceeding dismissed.

Because the Court found the two cases to be so closely related, the Court reopened Case No. 90–27588–BKC–AJC and consolidated it with the Case No. 98–25061–BKC–AJC. The Court thereupon asserted jurisdiction over the Commonwealth, granted Debtor's motion to reject the Settlement Agreement and reinstated the Final Judgment. The *Order Reopening Case No. 90–27588–BKC–AJC, Administratively Consolidating Cases and Reinstating Prior Judgment* (C.P. # 284 in Adv. No. 94–0467–BKC–AJC–A) was entered on January 5, 1999.

The matter now before the Court is Defendant's motion to dismiss, argued on January 5, 1999. The Commonwealth insists this Court lacks jurisdiction to adjudicate this adversary proceeding because the Commonwealth has not filed any proofs of claim in Case No. 98–25061–BKC–AJC and has not otherwise made a formal appearance in the case. However, this Court disagrees with the Commonwealth's assertion of a lack of jurisdiction. The Court determines that jurisdiction does exist and accordingly, will deny the *Motion to Dismiss.*

### Discussion

■ The Defendants appeared before this Court as a creditor of this Debtor in Case No. 90–27588–BKC–AJC. The Commonwealth filed proofs of claim and waived any claim of sovereign immunity under 11 USC § 106 by filing those proofs of claim. The sole reason for the latest filing is due to alleged acts conducted by the Commonwealth in contravention of the terms of the Settlement Agreement, which have placed

the Debtor in a precarious financial position. Because the issues in Case No. 98–25061–BKC–AJC are inextricably intertwined with the issues in Case No. 90–27588–BKC–AJC, the Court found cause to reopen Case No. 90–27588–BKC–AJC and consolidate it with Case No. 98–25060–BKC–AJC and Case No. 98–25061–BKC–AJC on January 5, 1999. The principal defense of the Commonwealth is that it is protected by virtue of the sovereign immunity of the United States which it asserts has not been waived. The Commonwealth concedes that 11 U.S.C. § 106 operates to waive the government's right to sovereign immunity only when the government has filed a proof of claim. As a result of the Commonwealth filing timely proofs of claims against the Debtor's estate in Case No. 90–27588–BKC–AJC, the Court concludes that the Commonwealth has effectively waived its sovereign immunity and has determined that waiver is applicable to these jointly administered cases.

*I. Failure to State a Claim.*

*Standard of Review.* To state a claim for relief, FRCP 8(a), made applicable to adversary proceedings under FRBP 7008, requires, inter alia, "a short and plain statement of claim showing that the pleader is entitled to relief." The court must "take the material allegations of the complaint and its incorporated exhibits as true, and liberally construe the complaint in favor of the Plaintiff." *Burch v. Apalachee Community Mental Health Services, Inc.,* 840 F.2d 797, 798 (11th Cir.1988) (citations omitted), aff'd, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). At this initial stage of litigation, the Plaintiff is not required to prove its case or to identify its evidence. The "accepted rule" in the Eleventh Circuit applied to motions to dismiss appraises the sufficiency of the complaint. A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *SEC v. ESM Group, Inc.,* 835 F.2d 270, 272 (11th

Cir.1988), quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), cert. denied, 486 U.S. 1055, 108 S.Ct. 2822, 100 L.Ed.2d 923 (1988). The Court disagrees with the Commonwealth's assertion that Plaintiff failed to state a claim upon which relief can be granted because the complaint complies with the test for sufficiency of a complaint in this circuit. Moreover, the Court rejects the Commonwealth's attempts to interpose new arguments at the hearing, including abstention and failure to plead fraud with specificity. The Court notes that at the hearing on the *Motion to Dismiss* counsel for the Commonwealth admitted Hillard is entitled to its day in Court, but argued the litigation should not occur in this Court. In any event, the additional matters brought by the Commonwealth at the hearing on the motion to dismiss should have been pled properly, pursuant to FRBP 7012.

■ *Fraudulent Intent.* The Commonwealth contends that the Plaintiff did not plead properly there was actual fraudulent intent by the Defendant. There is no dispute that in order to prevail at trial, Plaintiff must prove the Commonwealth intended to commit the acts that constituted the alleged fraud on the Debtor and/or the Court. Although the circumstances constituting fraud must be plead with particularity, FRCP 9(b) requires only that intent be averred generally. The language of Hillard's complaint satisfies FRCP 9(b). The Complaint provides sufficient allegations against which the Defendant may frame a response to the complaint.

■ *Turnover.* The second count of the adversary complaint concerns the turnover of property of the estate. The Plaintiff previously filed a motion for turnover of property. However, the Court entered an *Order Denying Motion for Turnover Without Prejudice* on September 29, 1998, which states, in pertinent part: "Therefore while this Court is denying the Motion, it is without prejudice to the commencement

of an adversary proceeding seeking turnover or seeking to compel a state officer, agent or employee to comply with the provisions of the Bankruptcy Code." This order was not appealed and became a final order.

The Defendant contends that the forum selection clause contained in the Settlement Agreement requires any claim for turnover to be litigated in Massachusetts. In particular, the Commonwealth quotes paragraph seven of the Settlement Agreement:

> Hillard and the Commonwealth Agencies reserve and retain any and all rights they may have under applicable law with respect to the submission, review and payment ... of any and all Medicaid claims filed by Hillard with DMA on or before the date hereof; provided, however, that such rights will extend only to claims for services rendered on or after January 1, 1997.

However, the Court does not consider that language applicable to the turnover claim. The Count for turnover does not involve the construction, enforcement or resolution of any disputes arising out of or related to the agreement but concerns non-payment for services rendered. The Debtor does not challenge the rate of reimbursement it received during 1997, but asserts that the Commonwealth failed to pay certain claims due and owing between January 1, 1997 and December 31, 1997. Because no answer has been filed, these allegations must be taken as true. As previously noted by the Court, unless Debtor receives the payments to which it is entitled—in the correct amount and in a timely fashion—the likelihood of this Debtor's successful reorganization is dubious at best. The health, welfare and well-being of several hundred elderly residents of the two nursing homes of the Debtor may be affected by the outcome of this adversary proceeding.

## II  Sovereign Immunity.

*The Eleventh Amendment and State Sovereign Immunity.* A perplexing issue regarding the Eleventh Amendment arises when actions are filed against state officers and contested on the grounds that these actions violate the state's sovereign immunity. The Eleventh Amendment emerged in 1798 to assure the proper respect for state sovereign immunity under the United States Constitution.[2] Courts' interpretation of the Eleventh Amendment has effectively and consistently ensured immunity when suits are against the states themselves; however, the federal judiciary has constructed limited applicability of sovereign immunity when individuals bring actions against state officials. The Eleventh Amendment lies at the center of the tension between state sovereign immunity and the need to have in place mechanisms for the effective vindication of federal rights. While the Eleventh Amendment by its terms does not bar lawsuits against a state by its own citizens, the Supreme Court has consistently held that an unconsenting state is immune from lawsuits brought in federal courts by its own citizens, as well as by citizens of another state. *Edelman v. Jordan,* 415 U.S. 651, 662, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (quoting *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)).

The statutory commands under the Bankruptcy Code relating to turnover (for example, that one in possession of estate property is required to turn over such property to a trustee or, as here, to the Chapter 11 debtor-in-possession) implicate the *Ex parte Young* doctrine. That legal fiction has been recognized in a similar case involving the turnover of Medicaid payments withheld from a debtor. *See Guiding Light Corporation v. Louisiana (In re Guiding Light Corporation),* 213 B.R. 489, 493 (Bankr.E.D.La.1997). The

**2.** The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI.

*Guiding Light* court held that the *Ex parte Young* exception to the Eleventh Amendment immunity allowed a Chapter 11 debtor/Medicaid provider to bring a cause of action against a state official.

*Ex parte Young.* The Supreme Court decision early this century in *Ex parte Young*, 209 U.S. 123, 160, 28 S.Ct. 441, 52 L.Ed. 714 (1908) evolved into the link between state sovereign immunity and the vindication of federal rights. The *Ex parte Young* doctrine permits federal courts to entertain actions seeking prospective injunctive relief against state officials who violate federal law. In *Ex parte Young*, the ultimate question was whether the State's attorney general could enforce a state rate-setting scheme that the objecting shareholders of railroad companies claimed was unconstitutional. The shareholders sought a federal injunction against Attorney General Young, prohibiting enforcement of the rate scheme. Attempting to show the lack of necessity for federal intervention, Young maintained the shareholders could wait until a state enforcement proceeding was brought against the railroads and then test the law's validity by raising constitutional defenses. The Supreme Court rejected that argument, first because a single violation might not bring a prompt prosecution; and second because the penalties for violations were so severe that a railroad official could not test the law without grave risk of heavy fines and imprisonment. The Court stated that a federal suit for injunctive relief would be "undoubtedly the most convenient, the most comprehensive and the most orderly way in which the rights of all parties can be properly, fairly and adequately passed upon." *Young*, 209 U.S. at 166, 28 S.Ct. at 456. The Supreme Court held that federal courts may exercise jurisdiction over a state official alleged to be acting in violation of federal law on the theory that the official's conduct stripped him " . . . of his official or representative character and . . . subjected him in his person to the consequences of his individual conduct". *Id.* Although the *Ex parte Young* doctrine has

eroded a bit over the years, i.e. *Edelman v. Jordan*, 415 U.S. 651, 664–67, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (*Ex parte Young* doctrine inapplicable to claims for retroactive relief or damages against the state treasury and limited to actions for prospective relief) the rate-setting scheme in this proceeding is similar to the facts in *Ex parte Young*, and the Court has determined the *Ex parte Young* doctrine applies to the instant proceeding.

*Recent Supreme Court Cases.* In considering the doctrine of sovereign immunity and, in particular, determining whether the application of *Ex parte Young* is appropriate in this adversary proceeding, this Court has relied on two recent Supreme Court cases. These cases are not dispositive of the issues herein, but are certainly helpful to the Court's decision. In 1996, the Supreme Court addressed the appropriateness of legal action against state officials in *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). More recently, in 1997, the Supreme Court carved out another exception to the *Ex parte Young* doctrine in *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997).

*The Seminole Case.* The *Seminole* decision arguably provides a general rule that courts will not grant *Ex parte Young* jurisdiction in all similar suits if a comprehensive remedial scheme exists. 517 U.S. at 74–75, 116 S.Ct. 1114. Quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686, the Court stated, "we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition . . . which it confirms." *Seminole*, 517 U.S. 44, 53–54 116 S.Ct. 1114, 1122 (1996). This presupposition, that each state is a sovereign entity in our federal system, and that "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent" was first stated by the Supreme

Court in 1890 in *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The *Seminole* Court held *Ex parte Young* inapplicable both because Congress had provided for an alternative statutory remedial scheme for tribes under the Indian Gaming Regulatory Act—which enables tribes to petition the Secretary of the Interior for alternative relief—and because it was not clear that Congress intended *Ex parte Young* to apply. *See Seminole*, 116 S.Ct. at 1132–33 (deeming *Young* a "narrow" exception to the Eleventh Amendment). A qualifying footnote, footnote 17, accompanying this language seems to limit the *Seminole* holding because it states: "[The Court] find[s] only that Congress did not intend [to grant jurisdiction under *Ex parte Young*] in the Indian Gaming Regulatory Act." *Seminole*, 517 U.S. at 75 n. 17, 116 S.Ct. at 1132–33 n. 17. In addition, the Supreme Court focused on the language of the statute and on whether it is directed at a "state" or a "state official". *Id.* The Court found this distinction significant because it indicated that Congress' intent in the Indian Gaming Regulatory Act was not to permit suits against state officials.[3] *Id.* at 75–76, 116 S.Ct. 1114. The only authority the Supreme Court relied on to support that theory is *State ex rel Stephan v. Finney*, 251 Kan. 559, 836 P.2d 1169 (1992). *Finney*, which arose from the Kansas Supreme Court, only addressed whether Kansas' governor had the ability to bind the state in a contract entered into with an Indian tribe under the Indian Gaming and Regulatory Act. The Kansas Supreme Court did not inquire into statutory construction or interpretation, and it only analyzed the policy of the State of Kansas with regard to actions of its officials. Thus, the Supreme Court's holding relied on a state court decision that is tenuously based to evidence Congress' intent not to allow a suit under *Ex parte Young*. The Court's use of this sole case, and the fact that the Court did not cite additional authority, are further support that the holding of *Seminole* is applicable only to suits brought under the Indian Gaming and Regulatory Act.

*Idaho v. Coeur d'Alene Tribe of Idaho.* In the *Coeur d'Alene* case, the Supreme Court explained that sometimes the exercise of a federal court's equitable jurisdiction is necessary to avoid "excessive and oppressive penalties, [the] possibility of [a] multiplicity of suits causing irreparable damage, or [the] lack of proper opportunities for [state] review." 521 U.S. at 273–74, 117 S.Ct. at 2036 (quoting, Warren, Federal and State Court Interference, 43 Harv.L.Rev., 345, 377–378 (1930)). In this case, a federally-recognized Indian tribe and individual tribal members brought an action against the state of Idaho and various state officials and agencies alleging ownership in submerged lands, in a lakebed and its tributaries, as all were contained within the boundaries of the reservation. The Supreme Court held that an action, which was the functional equivalent of a quiet title action, did not come within the doctrine of *Ex parte Young* and therefore was barred by the Eleventh Amendment. Specifically, this case held that an exception to Eleventh Amendment sovereign immunity under doctrine of *Ex parte Young* does not permit federal court action to proceed in every case where prospective declaratory and injunctive relief is sought against a State officer named in his official capacity.

Although the Supreme Court ruled that the Eleventh Amendment barred the tribe from bringing suit, the *Coeur* decision provides two useful insights. First, even if there is a prompt and effective remedy in a state forum, an instance in which *Ex parte Young* may serve an important interest is when the case calls for the interpretation of federal

---

**3.** However, the Court's dissenter noted that such a distinction is unprecedented. *Semi-*

*nole,* 116 S.Ct. at 1122 (Souter, J., dissenting).

law. This reasoning, which is described as the interest in having federal rights vindicated in federal courts, can lead to expansive application of the *Ex parte Young* exception. *See, e.g., Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985) (explaining that *Young* furthers the federal interest in vindicating federal law); *Pennhurst,* 465 U.S., at 104, 104 S.Ct., at 910 ("[T]he Young doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights."). For purposes of the Supremacy Clause, it is simply irrelevant whether the claim is brought in state court or federal court. However, this Debtor's ability to successfully reorganize its business and enjoy the fresh start afforded to it under the Bankruptcy Code and the issue of whether several hundred elderly residents could be turned away, as well as judicial economics, dictates that this Court is the appropriate forum in which this adversary proceeding should be commenced. Second, the Supreme Court has permitted federal actions to proceed even though a state forum was available to hear the plaintiff's claims. In fact, *Ex parte Young* itself relied on two such cases, both of which involved challenges to state enforcement of railroad rates. *See, Reagan v. Farmers' Loan & Trust Co.,* 154 U.S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014 (1894) and *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898). In both *Reagan* and *Smyth,* like *Ex parte Young,* the Court permitted the federal suit to proceed. The fact that the states had waived immunity in their own courts was not the sole basis for permitting the federal suit to proceed.

It is clear that the Supreme Court focused its energies in *Seminole* and *Coeur d'Alene* to prohibit tribes from bringing suit. The Court may have intended a narrow construction of these two cases to apply only in tribal actions. A majority of courts have not yet applied this new approach, so the more limited interpretation, that these cases apply only to suits under the Indian Gaming Regulation Act or regarding submerged lands, is certainly a

plausible reading of the law, as is the contention that the ever changing federal policy with respect to Indian tribes continues to evolve. Clearly, the *Ex parte Young* decision arose out of a need to protect federal rights, a need which emanated from the decision in *Hans v. Louisiana.* Until the Supreme Court overrules or otherwise disposes of *Hans,* the preservation of *the Ex parte Young* doctrine is necessary to assure that the states do not override the interests of the federal government and individuals.

*III. Subject Matter Jurisdiction.*

■ Notwithstanding the foregoing waiver of sovereign immunity and constitutionality of 11 U.S.C. § 106(a), the Commonwealth further suggests that this Court lacks subject matter jurisdiction and venue to consider any claims that arise out of or are related to the Settlement Agreement. This argument is completely specious to the present case. The gist of the Complaint is that the Commonwealth engaged in fraud against the Plaintiff and fraud upon the Court and appropriate relief is sought under FRCP 60(b), made applicable to this proceeding under FRBP 9024, to set aside the orders authorizing the Debtor to enter into the Settlement Agreement and approving the Settlement Agreement itself. The Commonwealth has failed to cite a single case in which a court order was required prior to the entry of a settlement agreement by the parties and a court order was required approving the settlement agreement. The cases cited by the Commonwealth are contract law cases that have no relevance to this particular adversary proceeding. The entire process surrounding the Settlement Agreement, including not only the execution of the Settlement Agreement but the obtaining of the orders through the Bankruptcy Court is, as alleged in the Complaint, a result of the fraud committed by the Commonwealth Defendants. Because the entire Settlement Agreement is alleged to be a product of fraud, it follows that the alleged

forum selection clause contained in the Settlement Agreement would also be the product of fraud. Therefore, evidence concerning the fraud is admissible in this Court. Assuming the truth of the allegations of fraud as set forth in the Complaint and because the Settlement Agreement has been avoided as an executory contract and state courts do not have a remedy which allows debtors in bankruptcy to avoid executory contracts, no portion of that Settlement Agreement, including the forum selection clause, can be enforced at this time. It is

**ORDERED AND ADJUDGED** that the Defendants' Motion to Dismiss is DENIED, and the Defendants shall answer the Complaint within twenty (20) days of the date of is Order.